# United States Court of Appeals
## For the First Circuit

No. 01-2057

WATER KEEPER ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL;
ALIANZA DE MUJERES VIEQUENSES; MARTA I. MELENDEZ;
SANDRA I. MELENDEZ; MIRIAM SOBA; CARMEN O. VALENCIA;
CABALLISTAS POR LA PAZ; JOSE M. EMERIC; COMITE PRO RESCATE Y
DESARROLLO DE VIEQUES; ROBERT RABIN; ANTONIO CORCINO;
MARIA O. NAVARRO; GRUPO DE APOYO TECNICO PROFESSIONAL AL
DESARROLLO SUSTENTABLE DE VIEQUES; JOSE RIVERA SANTANA;
REINALDO CAMACHO; CARLOS J. ASENCIO RIVERA; RADAMES TIRADO;
LUIS ACEVEDO,

Plaintiffs, Appellants,

1199-SEIU NEW YORK'S HEALTH AND HUMAN SERVICES UNION;
JUAN R. FERNANDEZ; VIEQUES WATER KEEPER; VICTOR EMERIC;

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF DEFENSE; DONALD H. RUMSFELD,
SECRETARY OF DEFENSE; THE DEPARTMENT OF NAVY; ROBERT B. PIRIE,
SECRETARY OF THE NAVY; THE SECRETARY OF THE INTERIOR GAIL
NORTON,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,

and Lipez, _Circuit Judge_.

_____

Robert F. Kennedy, Jr., with whom Scott A. Edwards, Maria Jimenez Colon, Celina Romany, and Foster Maer, were on brief, for appellants.

Kathryn E. Kovacs, Attorney, U.S. Department of Justice, with whom David C. Shilton, Attorney, U.S. Department of Justice, Wayne Hettenbach, Attorney, U.S. Department of Justice, Stephen G. Bartell, Attorney, U.S. Department of Justice, Eileen T. McDonough, Attorney, U.S. Department of Justice, John C. Cruden, Acting Assistant Attorney General, U.S. Department of Justice, Guillermo Gil, United States Attorney, Isabel Munoz Acosta, Assistant United States Attorney, Marc Swartz, U.S. Department of the Navy, Office of General Counsel, and Cathleen Reynolds, U.S. Department of the Navy, Office of General Counsel, were on brief, for appellees.

---

November 13, 2001

---

**STAHL, <u>Senior Circuit Judge</u>**.  Plaintiffs-appellants, Water Keeper Alliance et al. ("Water Keeper"), appeal the denial of their motion for preliminary injunction to stay Department of Navy (the "Navy," one of several defendants-appellees) military exercises on the island of Vieques off Puerto Rico. Water Keeper alleges violations by the Navy of certain procedural requirements under section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.  The district court found that Water Keeper had failed to show a strong likelihood of success on its ESA theory, that its showing of potential irreparable harm had not been strong, and that the balance of harms, as well as the interest of the public, weighed in favor of denying the motion. Since the denial of Water Keeper's motion for a preliminary injunction, the district court has additionally determined that it lacked jurisdiction over the ESA claims because Water Keeper, prior to bringing suit, failed to provide adequate 60-day notice as required by the citizen suit provisions of the ESA.  <u>See</u> ESA § 11(g)(2)(A), 16 U.S.C. § 1540(g)(2)(A).  We hold that notice was adequate for the purposes of the particular ESA claim on appeal here, but affirm on the merits the district court's denial of Water Keeper's motion for a preliminary injunction.

## I. Statutory Framework

-4-

The current appeal takes place against the background of a complex statutory framework that we examine at the outset of our opinion. The ESA directs federal agencies to insure that agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2). This substantive requirement is backed up by a scheme of procedural requirements that set up a consultation process between the agency (in this case the Navy) and the National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") (jointly, the "Services")[1] to determine whether endangered species or critical habitat are jeopardized by proposed agency action and whether this adverse impact may be avoided or minimized. See ESA § 7, 16 U.S.C. 1536.

---

[1]Under the ESA, the agency consults with the "Secretary," defined as the "the Secretary of the Interior [to whom the FWS reports] or the Secretary of Commerce [to whom the NMFS reports]." ESA § 3(15); 16 U.S.C. § 1533(15). Under the regulations, the agency consults with the "Director." The "Director" is defined as "the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration [under which the NMFS is housed], or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out." 50 C.F.R. § 402.02. The consultation function is carried out in practice by the FWS and the NMFS. The agency conducts separate consultations with the FWS and the NMFS.

Under the ESA, "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). Although the determination of possible effects is ultimately the agency's responsibility, see 51 Fed. Reg. 19949, in making this determination, the agency may consult with the Services through "informal consultation." The term simply describes discussions and correspondence between the Services and the agency designed to assist the agency in determining whether its proposed action is likely to impact listed species or critical habitat. Id. § 402.13. If, at the conclusion of the informal consultation, the Services issue written concurrences that a "proposed action is not likely to adversely affect any listed species or critical habitat," the agency may proceed with the action without further consultation between the parties. Id. § 402.14(b)(1).

However, where the proposed agency action rises to the level of a "major construction activity" the determination as to whether agency action may affect listed species or critical habitat cannot be made through informal consultation alone, but must be based on a "biological assessment." Id. § 402.12(b)(1); see also 51 Fed. Reg. 19948 (noting that the biological assessment may be conducted simultaneously with informal

-6-

consultation or without any informal consultation). A "major construction activity" is "a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].[2] 50 C.F.R. § 402.02. The biological assessment is a study that "evaluate[s] the potential effects of the action on listed and proposed species . . . and determine[s] whether any such species or habitat are likely to be adversely affected by the action . . . ." 50 C.F.R. § 402.12(a). If, following completion of the biological assessment, the Services issue written concurrences that the "proposed action is not likely to adversely affect any listed species or critical habitat," the consultation is terminated. Id. at § 402.14(b).

If, on the other hand, based on either informal consultation or a biological assessment, the Services are

---

[2]The referenced paragraph of NEPA, in turn, does not define "a major Federal action significantly affecting the quality of the human environment" in substantive terms but rather specifies that an environmental impact statement must accompany a proposal for such action. 42 U.S.C. § 4332(2)(C)(i). As discussed in Section V infra, courts have found that whether an agency is required to prepare a biological assessment depends on whether it is required to prepare an environmental impact statement under NEPA. See Hawksbill Sea Turtle v. FEMA, 11 F. Supp. 2d 529, 544 (D.V.I. 1998).

unwilling to concur that the agency action is unlikely to impact protected species and habitat, or if the agency independently concludes that its actions may affect listed species or critical habitat, the agency is required to initiate "formal consultation." See id., § 402.14(a)&(b)(1). Formal consultation is initiated by the written request of the agency describing the action and the manner in which it may affect listed species and critical habitat. Id. § 402.14(c). Significantly, "formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the [Services] in accordance with § 402.12." Id. § 402.14(c). Nonetheless, formal consultation may take place without a biological assessment if the action is not a major construction activity.

After a period of review and discussion, formal consultation culminates in the Services' issuance of biological opinions advising the agency "whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," and, if so, whether "reasonable and prudent alternatives" exist to allow the agency to comply with the ESA. 50 C.F.R. § 402.14(h); see also ESA § 7(b)(3)(A), 16 U.S.C. § 1536(b)(3)(A). If the Services conclude that the action, or the implementation

-8-

of any reasonable and prudent alternatives, comply with the ESA, the Services must also issue an "incidental take statement" that specifies the amount or extent of the authorized taking of the species. ESA § 7(b)(4), 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

With the basics of the statutory framework in place, we next consider the application of the ESA to the Navy in relation to its training exercises on Vieques.

## II. Background

The Navy has used the island for military exercises since 1941, including ship-to-shore and aerial bombing with live ammunition. Thirteen endangered and threatened species live on the island of Vieques and in surrounding water, and, as a result, in 1980 and 1981 respectively, pursuant to the ESA and after formal consultation, the NMFS and the FWS issued biological opinions regarding the effects of Navy exercises on the listed species and critical habitat. Both Services found no jeopardy to any listed species or critical habitat from naval exercises on Vieques.

Beginning in 1995, the NMFS and the FWS asked the Navy to reinitiate "formal consultations" with the Services to reexamine the effect of the military exercises on the endangered and threatened species of the island. The Services explained

that new information regarding the listed species had been obtained since 1981, that dead or injured species had been found after training exercises (the original biological opinion did not authorize any takings pursuant to ESA section 7(b)(4), 16 U.S.C. § 1536(b)(4)), and that reinitiation was typical after five years. In January 2000, after a period of informal consultation, the Navy agreed to initiate formal consultation with FWS and NMFS. The Navy further indicated its willingness to prepare a biological assessment in anticipation of formal consultation, despite the fact that, in its own determination, it was not required to do so under the regulations. (See 50 C.F.R. § 402.12(b)(1); 51 Fed. Reg. 19945, contemplating voluntary preparation of a biological assessment to assist in the determination of whether formal consultation is required.) On January 31, 2000, in the same month that the Navy agreed to reinitiate formal consultation with the Services concerning its use of the Vieques range, the President issued an Executive Order restricting the use of the Vieques training range to no more than 90 days per year and using only non-explosive ordnance. 65 Fed. Reg. 5729 (Feb. 24, 2000). These restrictions were put in place pending a referendum by the

citizens of Vieques on the future of Navy exercises on the island.[3]

The Navy has clarified that the biological assessment it agreed to prepare would "address continuing operations of the Vieques Inner Range assuming the referendum regarding the Navy's future use of the Range passes . . . ."[4] Indeed, the Navy completed and submitted this biological assessment to the Services in January 2001 and formal consultation between the parties is currently proceeding. However, the Navy further informed the Services that, pending the completion of formal consultation for long-term use of the range, it would continue to conduct periodic training exercises on Vieques in compliance with the conditions of the Executive Order. The NMFS and the FWS initially agreed to engage in informal consultation with the Navy on an exercise-by-exercise basis for the interim period and issued concurrences of no likely adverse effect for the May and June exercises, thereby exempting the Navy from the requirement to enter formal consultation with regard to these exercises.

_____

[3]The referendum, scheduled for November 2001, gives the citizens of Vieques a choice between allowing naval training, with live ordnance, to go forward indefinitely in return for a $50 million infrastructure development package, and requiring that the Navy leave the island by May of 2003.

[4]Letter from J.K. Moran, Rear Admiral, U.S. Navy to Sam Hamilton, Regional Director, FWS, R. Doc. 1 Ex. 22 (June 13, 2000).

After June 2000, the FWS changed its position and informed the Navy that it would require "interim formal consultation" for all exercises during the interim period of August 2000 to December 2001. The Navy agreed and, on July 12, 2000, provided FWS with a "consultation package" covering the planned training exercises through 2001. On July 27, 2000, the FWS issued a biological opinion reviewing the effects of the proposed interim exercises on the endangered and threatened species and finding that the exercises were not likely to jeopardize the continued existence of listed species or result in the destruction of critical habitat. FWS issued an incidental take statement with reasonable and prudent measures to ensure that any take would be minimized. Biological Opinion, R. Doc. 12, Ex. 24 (July 27, 2000). For its part, the NMFS continued to evaluate each interim exercise informally on an individual basis and has issued written concurrences for each exercise, finding no likelihood of adverse impact.

The issue on appeal here grows out of the interim formal consultations between the Navy and the FWS concerning the Navy's training activities on Vieques from August 2000 to December 2001. The ESA includes a citizen suit provision "to enjoin any person, including the United States and any other governmental instrumentality or agency" for a violation of the

ESA or issued regulations. ESA § 11(g)(1)(A), 16 U.S.C. § 1540(g)(1)(A). Invoking standing under the citizen suit provision, Water Keeper argues that the Navy's interim exercises on Vieques constitute a "major construction activity," that the Navy was therefore required to prepare a biological assessment directed at the effects of the interim training exercises, and that, contrary to the Navy's assertions, the July 12th consultation package did not satisfy this requirement. Water Keeper contends that the process by which the Navy received the go-ahead from the FWS to carry out exercises on Vieques from August 2000 to December 2001 was therefore procedurally flawed and the Navy's activities must be enjoined pending compliance with the ESA procedural requirements.[5]

---

[5]In the underlying case, Water Keeper also has alleged violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6903, violations of the Equal Protection Clause, and illegal takings of endangered species in violation of section 9 of the ESA, 16 U.S.C. § 1538. Water Keeper has further argued that the biological opinion issued by the FWS on July 27 was "arbitrary and capricious" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), in part because it was prepared without the benefit of the biological assessment. Water Keeper raised this legal theory in support of its motion for a preliminary injunction and it was considered by the district court (although determined not likely to succeed) as well as briefed by the appellees in this appeal. However, Water Keeper appears to have abandoned this theory, at least for the purposes of its appeal from the denial of the motion for a preliminary injunction, by not briefing the issue. Additionally, Water Keeper's counsel unequivocally stated during oral argument that the only issue on appeal was the claim against the Navy for failure to prepare a biological assessment. We accordingly do

-13-

It is important to note that Water Keeper's argument is a narrow one. As discussed above, the Navy has submitted a biological assessment to the Services regarding the long-term use of Vieques for naval exercises and formal consultation is proceeding. Water Keeper is not contesting the legality of the formal consultation addressing the long-term use of Vieques, nor is it contesting the exercise-by-exercise informal consultation between the Navy and the NMFS for the interim use of the island. Water Keeper's sole focus, at least for purposes of this appeal, is alleged procedural violations in the consultations between the Navy and the FWS for exercises from August 2000 to December 2001. Consequently, Water Keeper's request for injunctive relief, if granted, would only stay Navy exercises through December 2001.

**III. District Court Proceedings**

The district court denied Water Keeper's motion for a preliminary injunction. <u>Water Keeper Alliance</u> v. <u>U.S. Dep't of Defense</u>, No. 00-2295, R. Doc. 74 (D.P.R. June 9, 2001) (hereinafter "Water Keeper I"). The court assumed that the Navy was required to prepare a biological assessment, but held that the appellees were likely to succeed on the argument that, for

---

not consider the claim against the FWS. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

the interim exercises, the consultation package met the requirements of the biological assessment. Id. at 5-8. The district court further found that Water Keeper's showing of potential irreparable harm had not been strong. Id. at 12-13. Finally, the court held that the balance of equities favored the defendants, who pointed to concrete national security concerns over the more abstract harm to species asserted by Water Keeper, and that the public interest would consequently be harmed by a grant of preliminary injunctive relief. Id. at 13-16.

Water Keeper filed a timely appeal challenging the denial of its request for preliminary injunctive relief. We denied Water Keeper's request for a stay of planned exercises pending a decision on the appeal which was expedited.

Complicating our review, the district court has since dismissed Water Keeper's ESA claims, apparently essentially the same claims that are on appeal, for lack of adequate notice. The citizen suit provision of the ESA requires sixty days notice of intent to bring suit. ESA § 11(g)(2)(A), 16 U.S.C. § 1540(g)(2)(A). The court found that Water Keeper's Notice of Intent to Sue, R. Doc. 55, Ex. A (May 16, 2000) ("Notice"), did not include the claims upon which it sought relief. It did so because the Notice did not (indeed could not have, since it predated it) reference the July 2000 biological opinion, which

was the culmination of the formal consultation for the interim exercises, as the basis of its grievance. Water Keeper Alliance v. U.S. Dep't of Defense, No. 00-2295, R. Doc. 85 (D.P.R. July 17, 2001) at 15-25 (hereinafter "Water Keeper II"). Appellants have filed a motion for reconsideration of the ESA dismissal and, in the alternative, for a certification of interlocutory appeal. That motion is pending.

We briefly consider the notice question in Section IV and find that notice was adequate as to the ESA claim against the Navy. We then devote the bulk of our discussion, under Section V, to an examination of the motion for a preliminary injunction on its merits.

## IV. Notice

Although the certification for interlocutory appeal on the adequacy of notice is still pending, appellees correctly note that we have jurisdiction to consider adequacy of notice as a matter that is intertwined with the issues on appeal. See Xerox Fin. Servs. Life Ins. Co. v. High Plains Ltd. P'ship, 44 F.3d 1033, 1038 (1st Cir. 1995) (holding that, because the consideration of the preliminary injunction was "colorably dependent" on the denial of defendant's Rule 60(b) motion, this denial was also reviewable on appeal); Alloyd Gen. Co. v. Building Leasing Co., 361 F.2d 359, 363 (1st Cir. 1966) ("Our

-16-

jurisdiction embraces a consideration of such questions as are basic to and underlie the order supporting the appeal.").

We have previously read the 60-day notice requirement in environmental statute citizen suits strictly. See Garcia v. Cecos Int'l, Inc. 761 F.2d 76, 78-82 (1st Cir. 1985) (Resource Conservation and Recovery Act); Massachusetts v. United States Veterans Admin., 541 F.2d 119 (1st Cir. 1976) (Clean Water Act); cf. Maine Audubon Soc'y v. Purslow, 907 F.2d 265 (1st Cir. 1990) (finding that district court did not abuse its discretion when it sanctioned counsel for bringing ESA suit before 60 days after notice of intent to sue had been given). The notice provision provides agencies with an opportunity to resolve the dispute and take any necessary corrective measures before a resort to the courts, Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 520 (9th Cir. 1998), and we are not in disagreement with the district court that the notice must adequately inform the agency of the exact grievances against it, if it is to fulfill this purpose. Nevertheless, we find that Water Keeper did in fact provide adequate notice as to the narrow claim at issue here -- the Navy's failure to conduct a biological assessment.

The district court held that Water Keeper could not bring an ESA claim against the FWS for alleged deficiencies in

-17-

the July 2000 biological opinion, without specifically referencing that opinion in its Notice. Water Keeper II at 18-25. However, the court did not consider the adequacy of the notice for purposes of the ESA claim against the Navy. The May 2000 Notice, sent before the Navy and the FWS entered formal consultations for the interim period, admittedly does not notify the Navy that Water Keeper disputes its July 2000 determination to bypass a biological assessment in favor of a consultation package. But the letter does take issue with the fact that the Navy has been conducting military activities on Vieques for some years without the benefit of a biological assessment incorporating new scientific evidence.[6] To say that the Navy was not on notice that Water Keeper would object to the failure to prepare a biological assessment for its interim activities, when the Notice makes it clear that Water Keeper intended to challenge an ongoing delinquency in the preparation of a biological assessment, would be setting the bar for adequacy of

---

[6]Water Keeper states that "[u]nder § 7(c)(1) of ESA each Federal agency shall conduct a biological assessment for identifying any endangered species or threatened species . . . ." Notice of Intent to Sue, R. Doc. 55 Ex. A (May 16, 2000) at 5. Water Keeper additionally posits that "[s]ince th[e] 1981 biological assessment, scientists have compiled new information indicating that the Navy's activities may be destroying individuals and injuring their chances for survival . . . . [Through its refusal to reinitiate consultation] the Navy has violated . . . § 7(c)(1) of ESA." Id. at 6.

notice too high.  We therefore find that notice was sufficient for purposes of the ESA challenge against the Navy.

## V. Denial of Motion for Preliminary Injunction

A. Standard of Review

Under this circuit's formulation, trial courts follow a four-part framework in determining whether the grant or denial of preliminary injunctive relief is appropriate.  The district court considers: first, the likelihood that the party requesting the injunction will succeed on the merits; second, the potential for irreparable harm if the injunction is denied; third, the hardship to the nonmovant if enjoined compared to the hardship to the movant if injunctive relief is denied; and fourth, the effect of the court's ruling on the public interest.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).

The standard of review for an appellate court reviewing the grant or denial of a preliminary injunction is abuse of discretion.  Ross-Simons, 102 F.3d at 16.  This deferential standard, however, applies to "issues of judgment and balancing of conflicting factors," and we still review rulings on abstract legal issues de novo and findings of fact for clear error. Cablevision of Boston, Inc. v. Public Improvement Comm'n of the City of Boston, 184 F.3d 88, 96 (1st Cir. 1999) (quoting Ocean

-19-

Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 61 n.1 (1st Cir. 1998)).

We consequently review the district court's legal findings under the "likelihood of success" prong de novo. In contrast, we review the district court's judgment calls, applying appropriate standards, under the remaining three prongs for abuse of discretion.

B. Likelihood of Success

De novo review of a district court judgment requires that we view the case from the same position as the district court. See Environmental Protection Info. Ctr. v. The Simpson Timber Co. 255 F.3d 1073, 1078 (9th Cir. 2001). The citizen suit provision of the ESA, § 11(g), 16 U.S.C. § 1540(g), does not incorporate a standard for judicial review. What standard of review applies depends on the question being asked. Although circuit courts often look to the standard of review set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706, those circuits which have considered the issue have adopted standards of review based on the relevant portions of the APA governing what the agency has done (or failed to do). For instance, in Biodiversity Legal Foundation v. Babbitt, 146 F.3d 1249 (10th Cir. 1998), the court applied APA § 706(1) (stating that "[t]he

reviewing court shall -- (1) compel agency action unlawfully withheld or unreasonably delayed") to review FWS's refusal to make a preliminary finding on a listing decision.  See id. at 1252 (stating that "our review . . . focuses on . . . whether the Service's resulting failure to make a 90-day finding on the . . . petition is agency action unlawfully withheld").  In other cases, where the court is reviewing, for example, the Forest Service's timber management plan, or the Forest Service's approval of a plan to drill in the wild, the arbitrary or capricious standard of § 706(2)(A) has been applied.  See Sierra Club v. Glickman, 67 F.3d 90, 95 (5th Cir. 1995); Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 685-86 (D.C. Cir. 1982).  In still other cases, such as where a party challenges FWS's refusal to reinitiate consultation, § 706(2)(D) ("without observance of procedure required by law") is applied. Environmental Protection Info. Ctr., 255 F.3d at 1078, 1085. Even in cases citing to § 706(2)(A), it may be the "otherwise not in accordance with law" clause, rather than the "arbitrary, capricious" clause that governs.  See id. at 1078.

          This circuit has little discussion in caselaw on the standard of review of various issues which may arise under the

ESA. This case, an expedited preliminary injunction appeal, does not require us to resolve those issues. Even if we were to view Water Keeper's arguments under the most favorable standard of review to them -- essentially as legal issues of statutory construction, and without Chevron[7] deference to the agency -- Water Keeper has not shown probability of success.

As discussed in Section II supra, the requirement of a biological assessment is triggered if the agency action is a major construction activity. The relationship between a major construction activity, a biological assessment and formal consultation is a complicated one, deserving some more detailed explanation at this point. Formal consultation may not be initiated before a required biological assessment is completed, 50 C.F.R. § 402.14(c); that is not to say, however, that a biological assessment is always required for formal consultation to proceed. What triggers the requirement of a biological assessment is that the action is a major construction activity, Id. § 402.12(b), and not that the agency and Services have determined that they must enter formal consultation. Hence, the agency and the Services may conduct formal consultation without

---

[7]Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984).

a biological assessment if the action in question is not a major construction activity. Conversely, the preparation of a biological assessment does not automatically push the parties into formal consultation, but rather, formal consultation follows only if a biological assessment shows that the action "may affect listed species or critical habitat." See id. § 402.14 (a)&(b).

The Navy and the FWS had reached an understanding, discussed in Section III supra, that they were conducting formal consultations for the interim period of August 2000 to December 2001; indeed the formal consultations concluded in the issuance of a biological opinion and an incidental take statement. The formal consultations were procedurally flawed if they were initiated before "any required biological assessment had been completed . . ." (emphasis added). Id. § 402.14(c). Our first point of inquiry therefore is whether the interim activities constituted a "major construction activity" triggering the statutory requirement of a biological assessment. Id. § 402.12(b)(1). The district court did not address the first of these questions, but instead appears to have assumed that the interim training activities constituted a major construction activity under 50 C.F.R. § 402.12 (b)(1). See

Water Keeper I at 6.  We believe that the question is more difficult than the district court acknowledges.

A "major construction activity" is defined as a project that "is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. § 4332(2)(C)]."  50 C.F.R. § 402.02.  NEPA requires the preparation of an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332 (2)(C).  Appellees argue that, by implication, agency action can constitute a major construction activity, only if it necessitated the preparation of an environmental impact statement.  Because no environmental impact statement was prepared for the Navy's interim training activities on Vieques, appellees contend, the training activities from July 2000 to December 2001 do not constitute a "major construction activity" requiring a biological assessment.  See Hawksbill Sea Turtle v. FEMA, 11 F. Supp. 2d 529, 544 (D.V.I. 1998).  Appellees further point to the interim nature of the training activities in question as well as the fact that they are conducted with inert ordnance to argue that they do not rise to the level of an action significantly affecting the quality of the human environment.

-24-

Water Keeper counters that the NEPA regulations permit the agency, once a comprehensive environmental impact statement is in place, to rely on smaller-scale environmental assessments for "an action included within the entire program or policy." 40 C.F.R. § 1502.20. Water Keeper points out that the Navy's activities on Vieques were previously determined to be major federal actions subject to an environmental impact statement, see Romero-Barcelo v. Brown, 478 F. Supp. 646, 704 (D.P.R. 1979), aff'd in part, vacated in part on other grounds, 643 F.2d 835 (1st Cir. 1981), rev'd on other grounds, 456 U.S. 305 (1982), and argues that the interim activities have not necessitated the preparation of a new environmental impact statement because they fell into the exception created by the regulations for actions that are part of a larger program.

In considering a request for a preliminary injunction, we need not determine the outcome on the merits "with absolute assurance." Ross-Simons, 102 F.3d at 16; Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991). We cannot say that Water Keeper has shown a probability at this stage that the Navy violated the ESA because it concluded that the interim activities -- for which no environmental impact statement had been prepared and which were arguably materially different from previous naval exercises in their short term nature and use of

-25-

only inert ordnance -- did not constitute a major construction activity necessitating a biological assessment.[8]

But even assuming that the Navy's activities did necessitate the preparation of a biological assessment, Water Keeper has not shown that the consultation package was not the functional equivalent of a biological assessment.  In reaching the same conclusion, the district court focused on the fact that the contents of a biological assessment are discretionary, see 50 C.F.R. § 402.12(f), and that the Navy's consultation package contained much of the discretionary content of a biological assessment, including a list of endangered and threatened species, description of the species' habitats, reasons for their decline, action taken to protect the species, results of aerial surveys, and a list of restrictions on military exercises. Water Keeper I at 8.

Of course the discretionary nature of the contents of the biological assessment should not detract from the fact that it is prepared in fulfillment of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), see also 50 C.F.R. 402.14(d), and that it

---

[8]Although the regulations are not entirely clear as to who decides whether an agency action is a major construction activity (i.e. the agency or the Services), the Services' explanatory comments suggest that the Navy would make this determination: "The biological assessment process begins when a Federal agency decides that its action is a major construction activity . . . ." 51 Fed. Reg. 19946.

consequently must "use the best scientific and commercial data available." We are unable, however, to find that Water Keeper is likely to succeed on the argument that the Navy did not use the best scientific and commercial data available. Water Keeper's contentions to this end essentially boil down to the fact that the Navy did not consult two available studies on brown pelicans, an omission that is not sufficient to find the consultation package inadequate, at least at this preliminary stage. Water Keeper's additional assertion that the Navy could not have possibly relied on the best scientific and commercial data available, given that it had not completed many of the studies that would be incorporated in a future biological assessment for the long-term use of the island, has more analytical appeal. However, the very fact that these studies were not completed means that they were not available at the time of the preparation of the consultation package. We cannot say that the decision by the Navy and the FWS to proceed with the formal consultation on the interim training exercises before the completion of the long term studies violated the ESA's procedural requirements.

We therefore hold that the district court was correct in finding that Water Keeper was unlikely to succeed on the merits. We review the next three prongs in the standard for preliminary

injunction for abuse of discretion, as discussed above, and accordingly decide them with relative speed.

## C. Potential for Irreparable Harm

To be entitled to preliminary injunctive relief, appellants must demonstrate that they will otherwise suffer irreparable harm. The district court found that Water Keeper's showing of irreparable harm was insufficient. We agree.

Water Keeper first contends that a procedural violation of the ESA itself constitutes irreparable injury. It is true that the ESA restricts the equity power of the court as to findings of irreparable injury. See Tennessee Valley Auth. v. Hill, 437 U.S. 153 (1978). But Water Keeper's argument is misplaced and ignores context. On the facts of this case, Water Keeper has not shown that the statute entitles it to insist on the procedure of no action taking place until a biological assessment has been filed with the Service. Here, there is a serious question as to whether the Navy was required to prepare a new biological assessment and whether what the Navy submitted was not the functional equivalent of a biological assessment. This context places the case outside of Hill and outside of the reach of Massachusetts v. Watt, 716 F.2d 946 (1st Cir. 1983).

As a result, the district court correctly required that Water Keeper show potential for irreparable harm "apart from the harm that they argue is inherent in a procedural violation of the ESA's consultation requirements . . . ." Water Keeper I at 12. Furthermore, the court did not abuse its discretion when it determined that Water Keeper's assertions concerning irreparable harm stemming from the "death of even a single member of an endangered species" were insufficient to justify granting injunctive relief. Id. at 12. In support of its position of irreparable harm, Water Keeper can only point to vague concerns as to long-term damage to the endangered species expressed by FWS and NMFS.[9] In the absence of a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species, the district court's conclusion that Water Keeper has failed to show potential for irreparable harm was not an abuse of discretion.

D. Balance of Relevant Impositions & Public Interest

In response to the claimed danger to endangered species asserted by Water Keeper, the Navy argues that the loss of Vieques as a training ground will adversely affect military

_____

[9]See Letter from NMFS, Southeast Regional Office to Captain J.K. Stark Jr., USN, Commanding Officer, U.S. Naval Station, R. Doc. 1 Ex.19 (July 1, 1999). Letter from FWS to Rear Admiral J.K. Moran, Department of the Navy, Commander Navy Region Southeast, R. Doc. 1, Ex 20 (June 15, 2000).

preparedness. Water Keeper correctly contends that, by enacting the ESA, Congress has already determined that the "'balance of hardships and the public interest tips heavily in favor of protected species.'" Strahan v. Coxe, 127 F.3d 155, 171 (1st Cir. 1997) (quoting National Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1510 (9th Cir. 1994)). See also Tennessee Valley Auth., 437 U.S. at 184-185 (finding that the ESA "reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies"). While these precedents direct us to give the endangerment of species, as alleged by Water Keeper, the utmost consideration, we do not think that they can blindly compel our decision in this case because the harm asserted by the Navy implicates national security and therefore deserves greater weight than the economic harm at issue in Strahan.[10]

---

[10]Water Keeper argued, for the first time during oral argument, that the appropriate place for appellees' military preparedness argument is not the balancing of harms under a preliminary injunction, but the national security exception under ESA § 7(j): "Notwithstanding any other provision of this chapter, the [Endangered Species Committee, see 16 U.S.C. § 1536 (e)] shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j). Water Keeper has forfeited this argument by not properly raising it in its brief. Except in extraordinary circumstances, a court of appeals will not consider an issue raised for the first time at oral argument. See Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990).

Water Keeper argues in response that military preparedness will not be affected to the extent that appellees allege. Water Keeper first points out that the Navy statements on which the district court relied in determining the harm to national security assumed that the training exercises utilized live ordnance, whereas the Navy was utilizing inert ordinance, arguably creating a less realistic and thus less instructional simulation of battle. Second, Water Keeper contends that alternative sites can provide the same training opportunities as Vieques. While acknowledging that these arguments could have some merit, the district court determined on the whole that the Navy's evidence in support of its contentions was more reliable and additionally cautioned against substituting judicial judgment for agency judgment in considerations of how and where the Navy should train. The court did not abuse its discretion in coming to this conclusion.

E. Effect on the Public Interest

The effect of a preliminary injunction on the public interest is directly tied to its impact on both military preparedness and the endangered and threatened species. For the same reasons laid out above, the district court did not abuse its discretion in finding that the public interest weighed in favor of denying a preliminary injunction. We also note that

-31-

the two Services charged with protecting the endangered species have not objected to the interim exercises or the process used by the Navy.

## VI. Conclusion

For the reasons stated above, we find that Water Keeper's request for preliminary injunctive relief was properly denied.

**<u>Affirmed.</u>**