COMMON SENSE SALMON RECOVERY, et al., Plaintiffs,

v.

Donald L. EVANS, Secretary, U.S. Department of Commerce, et al., Defendants,

v.

National Wildlife Federation, et al. Intervenor Defendants.

No. CIV.A.99–1093(JR).

United States District Court, District of Columbia.

Aug. 10, 2004.

David A. Super, Baker Botts, LLP, Nancie G. Marzulla, Roger Joseph Marzulla, Marzulla & Marzulla, Lisa Marie Jae-

ger, Bracewell & Patterson, L.L.P., Washington, DC, James M. Johnson, Olympia, WA, for Plaintiffs.

Ruth Ann Lowery, Samuel D. Rauch, II, U.S. Department of Justice, Washington, DC, for Defendants.

Patti A. Goldman, Todd D. True, Kristen L. Boyles, Patti A. Goldman, Earthjustice Legal Defense Fund, Seattle, WA, for Intervenor Defendants.

Russell C. Brooks, Bellevue, WA, for Amicus.

## MEMORANDUM

ROBERTSON, District Judge.

Common Sense Salmon Recovery, a non-profit group, and four of its member organizations (collectively "CSSR"), allege violations of the Endangered Species Act ("ESA"), the Magnuson–Stevens Act, the Sustainable Fisheries Act ("SFA"), and the National Environmental Policy Act ("NEPA") in connection with the Commerce Department's National Marine Fisheries Service ("NMFS") listing of four types of West Coast Chinook salmon as threatened or as endangered. National Wildlife Federation, also a non-profit group, and a coalition of environmental and fisheries organizations have intervened on the side of the government. Amicus curiae submissions on the plaintiffs' side have been filed by three Washington state counties, the Pacific Legal Foundation, and others. All of the parties have moved for summary judgment, and the government has moved for a partial stay. For the reasons stated below, the partial stay motion will be **granted**, and the rest of the case (that which is not stayed) will be **dismissed**.

### Background

The Endangered Species Act, 16 U.S.C. § 1531 et seq., was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the [international conservation] treaties and conventions" to which the United States is a party. 16 U.S.C. §§ 1531(a), (b). The Act requires appropriate agencies, including NMFS, to promulgate regulations for identifying species that are subject to "present or threatened destruction, modification, or curtailment of its habitat or range; ... overutilization for commercial, recreational, scientific, or educational purposes; ... disease or predation; ... the inadequacy of existing regulatory mechanisms; or ... other natural or manmade factors affecting its continued existence." Id. § 1533(a)(1). When a species is found to meet such criteria, the responsible agency informs the Secretary of the Interior, who then "lists" that species in accordance with the terms of the ESA. Id. § 1533(a)(2). An endangered or threatened species determination must be based "solely on the ... best scientific and commercial data available ... [after] a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species." Id. § 1533(b)(1)(A). Concurrent with such a determination, the agency shall "designate any habitat of such species which is then considered to be critical habitat." Id. § 533(a)(3)(A)(i).

"Species" is a legislatively defined term that includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. § 1532(16). An endangered species is one that is "in danger of extinc-

tion throughout all or a significant portion of its range," *id.* § 1532(6), and a threatened species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

Thirteen years ago, the NMFS issued a "[n]otice of interim policy" to announce how it would apply the definition of species in evaluating Pacific salmon stocks for listing under the ESA:

A stock of Pacific salmon will be considered a distinct population, and hence a species for purposes of listing under the ESA, if it represents an evolutionarily significant unit (ESU) of the biological species. A stock must satisfy two criteria to be considered an ESU:

(1) It must be reproductively isolated from other conspecific population units; and

(2) It must represent an important component in the evolutionary legacy of the species.

*Interim Policy on Applying the Definition of Species under the Endangered Species Act to Pacific Salmon,* 56 Fed.Reg. 10,542, 10,543 (Mar. 13, 1991). NMFS placed this interim policy in effect until revised or superseded, solicited written comments, and, after receiving twenty-one comments, announced its final policy on November 20, 1991. *See id.; Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon* ("ESU Policy"), 56 Fed.Reg. 58,612 (Nov. 20, 1991).

Shortly thereafter, and about eleven years ago, NMFS issued its *Interim Policy on Artificial Propagation of Pacific Salmon Under the Endangered Species Act,* 58 Fed.Reg. 17,573 (Apr. 5, 1993) ("Hatchery Policy"). Like the ESU Policy, this one was also placed into effect until revised or superseded. The Hatch-

ery Policy (which has not been revised or superseded) explains how NMFS deals with artificial propagation—*i.e.* hatchery propagation—when defining ESUs and when making listing decisions about Pacific salmon. *See id.;* Defs.' Mem., at 10. The Hatchery Policy states in part:

If available information indicates that either (1) the hatchery population in question is of a different genetic lineage than the listed natural populations, (2) artificial propagation has produced appreciable changes in the hatchery population in characteristics that are believed to have a genetic basis, or (3) there is substantial uncertainty about the relationship between existing hatchery fish and the natural population, the existing hatchery fish will not be considered part of the biological ESU and will not be included as part of the listed species. In this case, direct take of fish from the listed species for broodstock would not be permitted, and hatchery operations would need to be consistent with ESA requirements . . . .

58 Fed.Reg. at 17,575.

After announcing the Hatchery Policy, NMFS initiated a comprehensive status review for populations of Pacific salmon in Washington, Oregon, Idaho, and California that were not otherwise undergoing status reviews at that time. *See* 59 Fed.Reg. 46,808 (Sept. 12, 1994). On March 9, 1998, NMFS announced that it had completed its review and proposed the listing as threatened or endangered species seven ESUs of West Coast Chinook salmon. *See* 63 Fed.Reg. 11,482 (Mar. 9, 1998). A year later, after receiving comments, NMFS issued its final rule, concluding that four Chinook salmon ESUs warranted protection and should be listed: the Puget Sound Chinook salmon in Washington, Lower Columbia River Chinook salmon in Washington and Oregon, and Upper Willamette

spring-run Chinook salmon in Oregon as threatened species; and the Upper Columbia River spring-run Chinook salmon in Washington as an endangered species. *See* 64 Fed.Reg. 14,308 (Mar. 24, 1999). The plaintiffs in this case, whose interests may broadly be characterized as those of builders, realtors, farmers, and cattlemen aggrieved by what they consider the overprotection of salmon habitat, initiated this action on May 4, 1999. Their primary assertion is that the listing of these four salmon ESUs violated the Administrative Procedure Act ("APA").

## Analysis

Agency actions are reviewed under the APA, which authorizes courts to set them aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "For challenges to an agency's construction of the statutes or regulations that it administers ... the Court's review must be particularly deferential[:] The Court must defer to the agency's interpretation of a statute that it implements 'so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language.'" *Davis v. Latschar,* 202 F.3d 359, 364 (D.C.Cir. 2000) (quoting *OSG Bulk Ships, Inc. v. United States,* 132 F.3d 808, 814 (D.C.Cir. 1998)); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "The Court's 'task is to determine whether the agency's decisionmaking was reasoned, ... i.e., whether it considered relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record.'" *Davis,* 202 F.3d at 365 (quoting *Nat'l Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988)).

1. *Whether NMFS's adoption of the ESU Policy violated the APA (Cause of Action I).*

Plaintiffs' first cause of action presents a threshold challenge to the ESU Policy that was a building block of NMFS's listing decision, asserting that the ESU Policy was not adopted through notice and comment rulemaking as required by the APA. *See* Pls.' Second Am. Compl. ¶ 75.

This challenge is procedurally barred. The ESU Policy was adopted in 1991, and the first cause of action, filed eight years later in 1999, was untimely when filed under the general six-year statute of limitations applicable to suits against the United States. *See* 28 U.S.C. § 2401(a); *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,* 88 F.3d 1191, 1213–14 (D.C.Cir.1996)(stating that the appropriate way to challenge a longstanding regulation as violative of a statute is to file a petition for amendment or rescission and then challenge the denial of that petition); *Defenders of Wildlife v. Norton,* 257 F.Supp.2d 53, 66 n. 11 (D.D.C.2003).

Moreover, regardless of whether the policy was a substantive rule requiring notice and comment rulemaking before promulgation, *see* 5 U.S.C. § 553, or an "interpretative rule[ ], general statement[ ] of policy, or rule[ ] of agency organization, procedure or practice" exempted from these requirements, *see id.* § 553(b), it was promulgated after a formal notice-and-comment opportunity. *See* 56 Fed.Reg. 10,542, (Mar. 13, 1991) (Notice of Interim Policy); 56 Fed.Reg. 58,612 (Nov. 20, 1991) (Notice of Policy).

2. *Whether NMFS's listing of four West Coast Chinook salmon was arbitrary and capricious, violated the ESA and was procedurally defective (Cause of Action II).*

Plaintiffs present their central challenge in their second cause of action,

which asserts that NMFS's listing of the four Chinook salmon ESUs was arbitrary and capricious and in violation of the ESA. Defendants' first response was that the Court should stay its consideration of the validity of the listing of all but the Upper Columbia River spring-run Chinook salmon because NMFS conceded that the other three listings (of Puget Sound, Lower Columbia River, and Upper Willamette spring-run Chinook) were "flawed", after the decision of another court, see Defs.' Mem., at 2; see also Alsea Valley Alliance v. Evans, 161 F.Supp.2d 1154 (D.Or.2001),[1] and because NMFS was conducting a review of those listings and the Hatchery Policy. See Defs.' Mem., at 2. (Intervenor defendants did not object to the stay request, but argued that the listings were proper under the ESA and the APA.)

■ NMFS has now published a proposed revision of the Hatchery Policy, see *Endangered and Threatened Species: Proposed Policy on the Consideration of Hatchery–Origin Fish in Endangered Species Act Listing Determinations for Pacific Salmon and Steelhead,* 69 Fed. Reg. 31,354 (Jun. 3, 2004), and a proposed rule to revise the listing status of 25 currently listed West Coast salmon ESUs (and to list two additional salmon ESUs), including the Puget Sound, Lower Columbia River, and Upper Willamette spring-run Chinook salmon. *See Endangered and Threatened Species: Proposed Listing Determinations for 27 ESUs of West Coast*

*Salmonids,* 69 Fed.Reg. 33,102 (Jun. 14, 2004). Defendants state that "final decisions on the proposed listing rule [must be made] by June 14, 2005," and they "expect to adopt a final hatchery listing policy several months before issuing the final listing revisions rule [because they] will use that final policy in making [their] final listing decisions." See Defs.' Notice of Recent Devels., Ex. A. Plaintiffs have not asserted that they will suffer immediate harm if the listing of these three Chinook salmon is allowed to stand pending the issuance of the revised Hatchery Policy and the listing determination. The motion for a stay will accordingly be granted, to and including June 14, 2005.

No party has moved for a stay as to the listing of the Upper Columbia River spring-run Chinook salmon. This salmon, however, is one of the 25 listed West Coast salmon currently under review by the defendants, and it is a subject of the proposed rule published at 69 Fed.Reg. 33,-102. Moreover, although the listing of this salmon is not directly implicated by the *Alsea* decision, the Hatchery Policy, which is being revised, was considered as part of this salmon's listing determination. *See* Hatchery Policy, 64 Fed.Reg. at 14,325. In the absence of a claim of immediate irreparable injury, the Court will also stay consideration of the validity of the listing of the Upper Columbia River spring-run Chinook salmon, until June 14, 2005.

---

1. In *Alsea Valley Alliance,* the district court held that NMFS improperly listed Oregon Coast coho salmon because it did not include hatchery coho populations in determining whether listing was warranted even though they were found to be part of the same ESU as natural coho populations. The court explained:

 The distinction between members of the same ESU/DPS is arbitrary and capricious because NMFS may consider listing only an

entire species, subspecies or distinct population segment ("DPS") of any species. 16 U.S.C. § 1532(16). Once NMFS determined that hatchery spawned coho and naturally spawned coho were part of the same DPS/ESU, the listing decision should have been made without further distinctions between members of the same DPS/ESU.

*Alsea Valley Alliance,* 161 F.Supp.2d at 1162 (emphasis in original).

3. *Whether the NMFS has violated the ESA by allowing fishing "through the adoption of regulations, incidental take permits and/or the ESA consultation process" (Cause of Action III).*[2]

Plaintiffs' third cause of action appears at first glance to be at odds with the first two, until one absorbs the essence of the underlying dispute in this case, which appears to be a marine fisheries version of "farmers versus cowmen." Plaintiffs are concerned that NMFS is overprotecting salmon *habitat* (their bailiwick) and allowing too much fishing (someone else's problem). Thus, plaintiffs assert that the NMFS violated the ESA by allowing fishing on listed salmon through "adoption of regulations, incidental take permits and/or the ESA consultation process," Second Am. Compl., at ¶ 81, which have contributed or will contribute to the further unnecessary decline of listed Chinook salmon. They say that such actions constituted a failure to use the NMFS's authority, as is required, to conserve these fish, and that it constituted "an irretrievable commitment of resources." *Id.*, at ¶¶ 82–83. Because plaintiffs' second amended complaint uses language in the third cause of action that would support a claim under both the APA and § 1540(g)(1) of the ESA, defendants offer two theories for dismissal: failure to identify a final agency action that violated

the ESA, and failure to comply with the sixty-day notice requirement before filing a citizen suit.

a. Failure to identify a final agency action

 Plaintiffs' third cause of action purports to seek review of an agency decision under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, but it must be dismissed for lack of subject matter jurisdiction because it does not identify a "final agency action." Claims under the ESA that challenge final agency actions as to which there is no specific review provision are governed by the APA. *See Bennett v. Spear*, 520 U.S. 154, 161–62, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). "Whether there is a final agency action is ... a jurisdictional question[:] With a few exceptions, if there is no final agency action, there is no basis for review of the government's decision or policy." *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C.Cir.2001). "For there to be 'final' agency action, there must, of course, be 'agency action.'" *Impro Prods., Inc. v. Block*, 722 F.2d 845, 848 (D.C.Cir.1983). The APA provides that "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial

---

**2.** As an initial matter, for the reasons discussed, *infra*, I will not accept plaintiffs' invitation to deny defendants' motion for partial summary judgment as to causes of action three to five "because the Administrative Record simply was not filed with respect to [these c]auses of action." Pls.' Opp'n, at 2. As to the third cause of action, Plaintiffs' failure to indicate the final agency action being challenged obviated the need for defendants to file an administrative record as to such an action. Regarding the fourth cause of action, plaintiffs have not properly raised a claim as to Amendment 14, thus relieving defendants' obligation to file an administrative record as to the Amendment, and this assertion has already been rejected as to any other claim plaintiffs might have under these acts. *See Common Sense Salmon v. Evans*, 217 F.Supp.2d 17, 21 (D.D.C.2002) ("[P]laintiffs fail to clarify what they contend their Magnuson–Stevens Act and Sustainable their Magnuson–Stevens Act and Sustainable Fisheries Act claims are ... [and] the Court agrees that it would be unduly burdensome for defendants to search for, copy and produce all records based on plaintiffs' speculative claim."). Finally, without some guidance from the plaintiffs as to what action they are challenging under NEPA, there is no administrative record to be filed concerning the fifth cause of action.

thereof, or failure to act." 5 U.S.C. § 551(13).

Plaintiffs complain that, through the adoption of regulations, the issuance of incidental take permits and the ESA consultation process:

> Defendants have directly approved or consulted and then allowed the take of the[ ] listed [C]hinook salmon . . .
> [and]
> Defendants have authorized or allowed the harvest and bycatch of these listed salmon . . . allowing tribal and other fisheries, including commercial netting in the river spawning areas . . . .

Second Am. Compl., at ¶¶ 80, 82.

Instead of pointing to any specific instance where defendants have taken these complained-of actions, plaintiffs appear to assert that the NMFS took final agency action by taking too long to make effective the listing of the four salmon. *See* Pls.' Opp'n, at 16 ("[A]n obvious example [of NMFS allowing 'take' of the four salmon is] the expansion of ocean fisheries, which would require either 'Take Permit' or Section 7 consultation[3] after listing [but] was frustrated through the unprecedented 'stay' of the listing for 60 days."). They note that in the NMFS's final agency rule announcing the listing of the four salmon, the agency stated that it was going to delay the effective date of the listing for sixty days, explaining:

> Given the cultural, scientific, and recreational importance of [C]hinook salmon, and the broad geographic range of these [C]hinook salmon ESUs, NMFS recognizes that numerous parties may be affected by this listing. Therefore, to permit an orderly implementation of the consultation requirements and take prohibitions associated with this action, this final listing will take effect on May 24, 1999.

64 Fed.Reg. at 14,326. Plaintiffs claim that "[t]here is no authorization in the ESA for a 'stay' of listing, and there is no precedent to delay a listing to allow further kill of a species, given the conservation policies of this Act." Pls.' Opp'n, at 17.

What plaintiffs appear to be seeking in this cause of action is "wholesale improvement" by court decree of the way in which the NMFS makes and effectuates listing determinations. That approach ignores what this Court cannot ignore, namely *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), which made it clear that the final agency action requirement of the APA, 5 U.S.C. § 704, bars federal jurisdiction over suits for broad programmatic relief.

---

**3.** The section 7 consultation requirement states that

> [a]fter initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d). Section (a)(2) provides that

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee . . . .

*Id.* § 1536(a)(2).

### b. Failure to comply with the sixty day notice requirement

■ To the extent this cause of action is brought under § 1540(g)(1) [4] of the ESA, it must be dismissed for failure to comply with the ESA's sixty-day notice requirement. *See* 16 U.S.C. § 1540(g)(2)(A)(i) ("No action may be commenced under subparagraph (1)(A) of this section ... prior to sixty days after written notice of the violation has been given to the Secretary ....").

Interpreting a similar citizen suit sixty-day notice requirement, the Supreme Court explained that "the notice and 60–day delay requirements are mandatory conditions precedent to commencing suit[,]" which "a district court may not disregard ... at its discretion." *Hallstrom v. Tillamook County*, 493 U.S. 20, 31, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). Applying *Hallstrom* to the ESA, three circuits have held that "failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA." *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir.1998) (citation omitted); *see also Water Keeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21, 29 (1st Cir.2001); *Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency*, 126 F.3d 461, 471 (3d Cir.1997).

Plaintiffs did send a sixty-day notice letter to the Secretary of the Department of Commerce and the Director of the NMFS. The letter announced that

> [t]he suit will challenge NMFS's failure to follow proper procedure specified in the ESA and the APA when it listed the [C]hinook salmon; NMFS's failure to rely on the best scientific and commercial data available; and NMFS's arbitrary and capricious application of provisions of the ESA to the [C]hinook salmon listing.[5]

Notice Letter, Defs.' Mot. Protective Order, Ex. 15, at 1. It made no mention of the claim set forth in plaintiffs' third cause of action, which concerns the "allow[ance of] fishing on listed salmon through adoption of regulations, incidental take permits and/or the ESA consultation process." This letter therefore failed to satisfy the notice requirement as to this cause of action, which, in so far as it asserts a claim under § 1540(g)(1), must be dismissed for lack of subject matter jurisdiction.

### 4. Whether the NMFS failed to fulfill its duties under the Magnuson–Stevens Act and Sustainable Fisheries Act (Cause of Action IV).

Plaintiffs' fourth cause of action asserts that the defendants "did not timely comply with the [Magnuson–Stevens and Sustainable Fisheries Act's] requirement [of] adopt[ing] Management Plan amendments

**4.** With certain inapplicable exceptions, this section authorizes suits by any citizen

> to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or
> ... to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the

> taking of any resident endangered species or threatened species within any State; or ... against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.
> 16 U.S.C. § 1540(g)(1).

**5.** The notice letter also mentioned claims under the Magnuson–Stevens Act and the Sustainable Fisheries Act. *See Notice Letter, Defs.' Mot. Protective Order, Ex. 15, at 1–2.*

and harvest regulations [by the] end of 1998, as required by the statute." Pls.' Opp'n, at 13. The action contemplated by this claim (amendment of the Pacific Coast Salmon Fishery Amendment Plan) was completed on October 20, 2000. *See Fisheries off West Coast States and in the Western Pacific; West Coast Salmon Fisheries; Amendment 14*, 65 Fed.Reg. 63,047, 63,048 (Oct. 20, 2000), and this claim is therefore moot. If and to the extent plaintiffs seek to challenge Amendment 14 itself, they have not amended their complaint to do so, nor have they demonstrated that they have satisfied the exhaustion requirements of the Magnuson–Stevens Act. *See* 16 U.S.C. § 1855(f)(1).

5. *Whether defendants have authorized salmon harvest and predation on listed salmon without an adequate environmental impact statement, in violation of NEPA (Cause of Action V).*

Plaintiffs' fifth cause of action asserts that "Defendants' actions to authorize harvest and bycatch of salmon listed for protection under the ESA causes direct, indirect and cumulative effects that have not been disclosed, analyzed, and discussed in an adequate environmental impact statement pursuant to [the National Environmental Policy Act ("NEPA")]." Second Am. Compl., at ¶ 89. "An agency's decision not to prepare an [environmental impact statement ("EIS")] can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Transp. v. Public Citizen*, — U.S. —, —, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (quoting 5 U.S.C. § 706(2)(A)). "Under NEPA, an agency is required to provide an EIS only if it will be undertaking a 'major Federal actio[n],' which 'significantly affect[s] the quality of the human environment.'" *Id.* (quoting 42

U.S.C. § 4332(2)(C)). "Persons challenging an agency's compliance with NEPA must 'structure their participation so that it … alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).

■ Here, plaintiffs have failed to identify any specific action, to say nothing of a "major Federal action," that has been taken by the defendants to authorize the harvest or bycatch of listed salmon. Nor have plaintiffs offered any evidence to show that they alerted the defendants to their position and contentions regarding a proposed major Federal action such that the defendants could be said to have failed to properly consider alternatives to that action that would mitigate the environmental impact on listed salmon. Both parties submitted materials outside the pleadings. After a thorough review of those materials, I find that there is no genuine issue of material fact and, because plaintiffs have failed to state a claim as to this cause of action, that defendants are entitled to judgment as a matter of law. *See Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141 (D.C.Cir.2004) (converting motion to dismiss to a summary judgment motion, where both parties submitted materials outside the pleadings and the district court relied on those materials in concluding that the plaintiff had failed to state a claim).

An appropriate order accompanies this memorandum.