# United States Court of Appeals
## For the First Circuit

No. 06-2733

NULANKEYUTMONEN NKIHTAQMIKON, DAVID MOSES BRIDGES,
VERA J. FRANCIS, HILDA LEWIS, DEANNA FRANCIS,
REGINALD JOSEPH STANLEY, MARY BASSETT,
Plaintiffs, Appellants,

v.

ROBERT K. IMPSON, Acting Regional Director, Eastern Region,
Bureau of Indian Affairs; GALE NORTON, Secretary of the
Interior, United States Department of the Interior,
Defendants, Appellees.

———

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. John A. Woodcock, Jr., U.S. District Judge]

———

Before
Torruella and Lipez, Circuit Judges,
and Fusté,[*] District Judge.

———

Patrick A. Parenteau, with whom Justin E. Kolber and David K.
Mears, of the Environmental and Natural Resources Law Clinic,
Vermont Law School, were on brief, for appellants.
    M. Alice Thurston, Attorney, Environment and Natural Resources
Division, U.S. Department of Justice, with whom Matthew J. McKeown,
Acting Assistant Attorney General, Caroline M. Blanco, Sara E.
Culley, Rebecca J. Riley, Elizabeth Ann Peterson, John Harrington
Assistant Regional Solicitor, Department of the Interior, and
Stephen L. Simpson, Assistant Solicitor for Trust Responsibility,
Department of the Interior, were on brief, for appellees.

———

September 14, 2007

———

———

[*] Of the District of Puerto Rico, sitting by designation.

**TORRUELLA, <u>Circuit Judge</u>.** This appeal arises from the Bureau of Indian Affairs ("BIA") approval of a lease of Passamaquoddy tribal land to a developer who wishes to construct a Liquified Natural Gas ("LNG") terminal in part on that land. Nulankeyutmonen Nkihtaqmikon[1] ("NN"), a group of tribe members who oppose construction of the LNG terminal, and several individual tribe members (collectively, "Plaintiffs") challenge the district court's dismissal of their case for lack of jurisdiction. After careful review, and based in large part on the BIA's change of position on appeal regarding the finality of its lease approval, we conclude that Plaintiffs have standing and that their claims are ripe for review, and therefore that the district court has jurisdiction to adjudicate Plaintiffs' claims. We thus reverse the dismissal of this suit by the district court and remand the case for further action consistent with this opinion.

## I. <u>Background</u>

### A. Quoddy Bay Lease

The complicated nature of this case requires a slightly extended introduction. Part of the complexity stems from the fact that neither of the litigants are parties to the lease agreement that precipitated this dispute. The lease at issue is between the

---

[1] "Nulankeyutmonen Nkihtaqmikon" translates into English from the Passamaquoddy language as "We Protect the Homeland." It is pronounced "Nu-lahnk-kay-yoot-mah-nin Nee-kaht-mee-kahn."

Pleasant Point Passamaquoddy Reservation[2] and Quoddy Bay, LLC ("Quoddy Bay"), a developer seeking to construct an LNG terminal on tribal lands. In May 2005, these parties formalized a ground lease agreement ("Quoddy Bay Lease"), which would allow Quoddy Bay to develop a LNG terminal on a 3/4-acre portion of tribally owned land known as Split Rock, pending federal approval of the project. The fifty-year lease is a complex and multistage contract, contemplating four distinct phases: Permitting, Construction, Operations, and Removal and Remediation. The latter periods call for heavily invasive construction and operation of the LNG terminal. The permitting period, however, allows only less-invasive testing and surveying, necessary for obtaining Federal Energy Regulatory Commission ("FERC") approval.[3] During this initial period, Quoddy Bay is limited to

> a non-exclusive right and license to enter
> upon and restrict access to the Premises, at
> any time and from time to time, to inspect, to

---

[2] The Passamaquoddy Tribe, a federally recognized Indian tribe, maintains two separate reservations, Pleasant Point and Indian Township, both in Maine. While each Reservation has its own elected tribal government, a Joint Tribal Council manages lands held in common. The Joint Tribal Council has authorized each community to lease tribal land within its own reservation.

[3] For LNG import facilities located onshore and near shore in state waters, FERC has "to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1). FERC reviews proposed LNG facilities with the cooperation of numerous federal, state, and local agencies, and with the input of other interested parties. 71 Fed. Reg. 14,200-201 (March, 21, 2006) (explaining the process FERC will undertake to review the Quoddy Bay LNG project).

> examine, to survey, and to conduct, soil tests, borings, installation of water monitoring wells, and other engineering, geotechnical, archaeological, and architectural tests and studies on the Premises, and otherwise to do that which, in Tenant's reasonable discretion, is necessary to conduct due diligence, to secure Permits and to determine the suitability of the Premises for the LNG Project.[4]

The Tribal Council approved the lease on May 19, 2005, and pursuant to the Indian Long-Term Leasing Act of 1955 ("Leasing Act"), 25 U.S.C. § 415, sent the lease to the BIA for review. On June 1, 2005, the BIA approved the lease.[5] At the same time, the BIA issued a Categorical Exclusion Checklist, indicating that

> lease approval is solely for the site investigation required for the [FERC] permitting process in the development of an [Environmental Impact Statement ("EIS")]. . . . [C]omplete environmental analysis and EIS development [will] be conducted through the FERC permitting process. Continuing the lease beyond the investigation period is contingent upon FERC permit approval, acceptability of the EIS analysis and insignificant impact on the leased property. The BIA will be a Cooperating Agency for the EIS development through FERC.

---

[4] At oral argument, Plaintiffs suggested that even during the site investigation period, Quoddy Bay was granted a right to exclude. Our analysis, however, does not depend on this allegation.

[5] The lease approval itself is a brief, one-sentence form attached at the end of the lease. It was signed by the Director of the Eastern Region of the BIA, Franklin Keel, and stated simply, "Approved: Secretary of the Interior."

-4-

The BIA determined that the site investigation fell within the definition of a Categorical Exclusion, such that an EIS was not required prior to approval of the lease.[6]

## B. Plaintiffs

In opposition to the LNG project, a group of private citizens banded together to form NN. NN members live on Passamaquoddy Tribal lands in Maine, though none possess individual ownership rights in Split Rock. They oppose the construction of the Quoddy Bay LNG terminal out of concern that "it will fundamentally and permanently transform the Split Rock site from a natural beach area with historical, cultural, religious, and recreational significance, to an industrial zone that will not be accessible to the members of the group."

Plaintiffs -- NN and individual tribe members -- live within a mile of Split Rock and/or use the leased land for traditional tribal ceremonies, community events, and recreation.

---

[6] The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., requires federal agencies to assess environmental impact before taking any "action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A detailed EIS is not required, however, for "categor[ies] of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. 1508.4. The BIA has adopted procedures governing which of its activities constitute such "Categorical Exclusions," and in this case, using the Checklist, determined that the Quoddy Bay Lease fell within its exclusion for "data gathering activities." See National Environmental Policy Act; Revised Implementing Procedures, 53 Fed. Reg. 10,439, 10,442 (Mar. 31, 1988).

According to Plaintiffs, Split Rock is the Tribe's "only remaining community space."

## C. Procedural History

On November 2, 2005, Plaintiffs initiated this suit claiming that the BIA's approval of the Quoddy Bay Lease violated the Leasing Act, 25 U.S.C. § 415; the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq.; the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 et seq.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. Specifically, Plaintiffs complain that the BIA failed to appraise the land, to prepare an environmental assessment, to provide an opportunity for public comment, or to consider the historical, religious, and cultural significance of the leased land. Plaintiffs later added a claim that, by violating the above statutes, the BIA had breached the federal government's fiduciary duty to Indian citizens (the "Trust Obligation" claim).[7]

The BIA moved to dismiss for lack of jurisdiction, contending that Plaintiffs lacked standing and that their claims were not yet ripe. On November 16, 2006, the district court dismissed all of Plaintiffs' claims, concluding that the NEPA, NHPA, and Trust Obligation claims were not ripe and that Plaintiffs

---

[7] The procedural history of this case is explained in more detail in the district court's opinion. See Nulankeyutmonen Nkihtaqmikon v. Impson, 462 F. Supp. 2d 86, 89-90 (D. Me. 2006).

-6-

lacked standing to bring the NEPA, NHPA, ESA, and Leasing Act claims.[8]  <u>Nulankeyutmonen Nkihtaqmikon</u> v. <u>Impson</u>, 462 F. Supp. 2d 86 (D. Me. 2006).  Plaintiffs now appeal the dismissal.

## II. <u>Standard of Review</u>

We review <u>de novo</u> the district court's decision to dismiss for lack of jurisdiction on standing and ripeness grounds. <u>Mangual</u> v. <u>Rotger-Sabat</u>, 317 F.3d 45, 56 (1st Cir. 2003).  The plaintiff has the burden of clearly alleging definite facts to demonstrate that jurisdiction is proper.  <u>Dubois</u> v. <u>U.S. Dep't of Agric.</u>, 102 F.3d 1273, 1281 (1st Cir. 1996).  We then construe such facts and the reasonable inferences drawn therefrom in favor of the plaintiff.  See <u>N.H. Right to Life Political Action Comm.</u> v. <u>Gardner</u>, 99 F.3d 8, 12 (1st Cir. 1996).

## III. <u>Finality of Lease Approval</u>

Plaintiffs ask us to forego review of the standing and ripeness issues and instead remand the case to the district court based on the BIA's "reversal of position" regarding the finality of its lease approval.  Plaintiffs claim that the BIA argued before the district court that lease approval was limited to site investigation and was revocable upon further review by the BIA, and that the district court relied heavily on these representations. On appeal, the BIA concedes that its lease approval is final.  It

_____

[8]  The APA claim was dismissed because, without the other statutory claims, NN had no private right of action.  <u>Nulankeyutmonen Nkihtaqmikon</u>, 462 F. Supp. 2d at 112.

-7-

argues instead -- but to the same effect -- that "implementation of the lease is contingent upon multiple factors, including FERC authorization," and that therefore Plaintiffs' alleged injuries resulting from construction of the LNG terminal are too attenuated to satisfy standing and ripeness requirements.

Because we review the standing and ripeness issues <u>de novo</u>, and because we have all the information we need to decide these issues, we see no reason to remand. We approach the standing and ripeness issues assuming -- as everyone agrees -- that the BIA has completed its lease approval process and will not have another opportunity to review the lease. For purposes of our review, we also assume, as alleged by Plaintiffs, that the BIA has failed to meet its federal obligations with respect to the lease approval. Whether or not this is true is a question on the merits of Plaintiffs' case, which we need not address at this stage of the proceedings.[9]

## IV. <u>Standing</u>

The doctrine of standing addresses whether a particular plaintiff has "such a personal stake in the outcome of [a] controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends

---

[9] In particular, the argument that the BIA will participate in the FERC permitting process -- and therefore that the BIA will have other chances to prevent the construction of the LNG terminal -- properly goes to the merits of the case, <u>i.e.</u>, whether the BIA has fulfilled its duties.

for illumination." Baker v. Carr, 369 U.S. 186, 204 (1962). The core of the doctrine arises from the constitutional requirement that federal courts act only on "Cases" or "Controversies." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); see also U.S. Const. art. III, § 2. In addition, "[s]tanding doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen v. Wright, 468 U.S. 737, 751 (1984). We begin with the challenged constitutional elements of standing before moving on to the additional prudential concerns.

## A. NEPA, NHPA, and ESA Claims

To satisfy the "irreducible constitutional minimum of standing," Plaintiffs must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the BIA's allegedly unlawful actions, and (3) that "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560-61 (internal quotation marks omitted). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

-9-

hypothetical."  Id. at 560 (internal citations, footnote, and internal quotation marks omitted).

In cases of alleged procedural harm, however, plaintiffs receive "special treatment."  Dubois, 102 F.3d at 1281 n.10 (internal quotation marks omitted).  "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  Lujan, 504 U.S. at 572 n.7.  For example,

> one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

Id.

The case before us is very similar to the above example described by the Supreme Court in Lujan.  Plaintiffs allege that they have been harmed by the BIA's failure to follow the procedures required by NEPA, NHPA, and ESA before approving the Quoddy Bay lease,[10] bringing their claims within the procedural standing

---

[10] For example, Count One of Plaintiffs' Second Amended Complaint alleges, inter alia, that "[t]he BIA breached its duty under NEPA by issuing a Categorical Exclusion for the lease approval because the effects of the ground lease constitute extraordinary circumstances that preclude it from categorical exemption under Appendix 2 of the BIA's Departmental Manual."  Count Three alleges that "[t]he BIA breached its duty under section 470a(d)(6) of the

-10-

analysis. With immediacy concerns relaxed, to establish an injury in fact, Plaintiffs need only show that NEPA, NHPA, and ESA were "designed to protect some threatened concrete interest" personal to Plaintiffs. Id. at 572-73 nn.7-8; see also Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 938 & n.2 (9th Cir. 2005) (focusing on the question of whether the procedures at issue "protect the plaintiff's concrete interest"). Here, Plaintiffs' concrete and particularized interest is clear: They not only live very near Split Rock, but they also use the land and surrounding waters for a variety of ceremonial and community purposes. See, e.g., Lujan, 504 U.S. at 572 n.7 ("[O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement . . . ."); Dubois, 102 F.3d at 1282-83 (finding sufficient interest where litigant regularly visited and "engaged in recreational activities" in the subject area); see also Ashley Creek Phosphate Co., 420 F.3d at 938 ("[P]laintiffs who use the area threatened by a proposed action or who own land near the site of a proposed action have little difficulty establishing a concrete interest."). The now-approved lease constitutes a

---

NHPA by failing to consult with the tribe before approving the ground lease on a site of religious and cultural significance to the Passamaquoddy Tribe and which is eligible for listing on the Registry of Historic Places." Plaintiffs' ESA complaint alleges, inter alia, that the BIA failed to consult with the National Marine Fisheries Service as to the impacts of the lease on certain whales.

-11-

"change in land use," which allegedly endangers the environment, the historic preservation of tribal land, and protected animal species in the area. The statutes in question were specifically designed to protect against these very dangers by requiring federal agencies, like the BIA, to consider these dangers before taking action. See Massachusetts v. Watt, 716 F.2d 946, 952 (1st Cir. 1983) (discussing the purposes of NEPA). Plaintiffs have therefore alleged a sufficient injury in fact to establish standing to pursue their procedural claims under NEPA, NHPA, and ESA.

The BIA focuses its arguments on the causation requirement of standing. The agency characterizes Plaintiffs' alleged injury as the harm to Split Rock, and consequently, Plaintiffs' interests in the land, resulting from the impacts of the construction of the LNG terminal. It goes on to argue that any such harms are not fairly traceable to the BIA's lease approval because the LNG terminal cannot be constructed until Quoddy Bay receives FERC approval, which is unpredictable.[11] Sea Shore Corp. v. Sullivan, 158 F.3d 51, 56 (1st Cir. 1998) ("[T]he injury is not imminent because it depends upon several tenuous contingencies."). This argument misapprehends the injury claimed by Plaintiffs. While it is true that the potential harm to Split Rock, and

---

[11] While the BIA frames this argument as one involving causation, it is actually a question of imminence under the injury-in-fact analysis. As stated above, and shown by the Lujan example, immediacy is not of particular concern here.

-12-

therefore to Plaintiffs, as a result of the construction of the LNG terminal is not certain, the procedural injury alleged by Plaintiffs has already occurred. See Watt, 716 F.2d at 952 ("[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered."). The procedures at issue seek to minimize the risk of future harm by "influenc[ing] the decisionmaking process; [their] aim is to make government officials notice environmental [and other] considerations and take them into account." Id. The lease contemplates construction and operation of a LNG terminal, and it is the risks posed by the implementation of the lease which the BIA is required to consider under NEPA, NHPA, and ESA. As discussed above, Plaintiffs have clearly established a demonstrable risk to their interests in Split Rock as a result of the BIA's alleged failure to adequately assess the dangers associated with the lease as required by federal law. Cf. Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989) ("[T]he [irreparable] harm consists of the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.").

Finally, Plaintiffs meet the redressability requirement of Article III standing. All that is required in cases of

-13-

procedural injury is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 127 S. Ct. 1438, 1453 (2007). Here, although Plaintiffs cannot establish with any certainty that the requested procedures will change the BIA's collective mind, there is at least a chance that proper consideration would convince the BIA to withhold approval of the lease.

Although the BIA does not challenge Plaintiffs' prudential standing to pursue the NEPA, NHPA, and ESA claims on appeal, it is clear from our discussion above that "the violations and injuries alleged in the complaint are the sort that [these statutes] were specifically designed to protect," and that Plaintiffs are asserting their own interests, rather than those of third parties.[12] Dubois, 102 F.3d at 1283 (internal quotation marks omitted). We accordingly find that Plaintiffs have established standing to pursue their procedural claims under these statutes.

---

[12] NN's organizational standing is clear: the interests asserted and evaluated are those of the individual members, see Dubois, 102 F.3d at 1281 ("A membership organization . . . may assert the claims of its members, provided that one or more of its members would satisfy the individual requirements for standing."); the interests in Split Rock are "germane to the objectives for which [NN] was formed," id. at 1281 n.11; and there is no reason the claim or requested relief "requires the personal participation of affected individuals," id.

-14-

**B. Leasing Act Claim**

The prudential standing concern at issue here is whether Plaintiffs' Leasing Act claim "fall[s] within the zone of interests protected by the law invoked."[13]  Allen, 468 U.S. at 751.  "The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision."  Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987).

We disagree with the district court's conclusion that Plaintiffs do not fall within the zone of interests protected by the Leasing Act.  It is true, as the district court emphasized, that the Leasing Act requires federal approval when "'restricted Indian lands, whether tribally or individually owned, [are] leased by the Indian owners.'"  Nulankeyutmonen Nkihtaqmikon, 462 F. Supp. 2d at 110 (quoting 25 U.S.C. § 415(a)).  The district court also agreed that "Plaintiffs are almost certainly correct that the Leasing Act was intended to protect 'Indian tribes and their members.'"  Id. (quoting San Xavier Dev. Auth. v. Charles, 237 F.3d 1149, 1153 (9th Cir. 2001)).  But we do not read the former passage referring to "Indian owners" to suggest that the duty owed by the

---

[13] Neither party raises constitutional standing concerns on appeal, and we see no obstacle to constitutional standing for the same reasons discussed above with respect to standing under NEPA, NHPA, and ESA.

-15-

BIA under the Leasing Act is limited to the land owners regulated by the Act.  But see Bullcreek v. U.S. Dep't of Interior, 426 F. Supp. 2d 1221, 1230 (D. Utah 2006) (denying standing to tribal members with no property interest in the leased land because the act refers to "Indian Landowners").  Rather, it clearly appears to us to be a limitation on the leases subject to the Leasing Act.

The federal government's duty under the Leasing Act, through the BIA, is to ensure that the parties to a lease of Indian land have given adequate consideration to the impacts of the lease on, inter alia, neighboring lands and the environment.  25 U.S.C. § 415(a).  The land owners presumably have a vested interest in a lease's approval, so it stands to reason that they would rarely challenge the BIA's failure to comply with federal law in approving the lease.  Congress surely intended, therefore, for other tribal members whose interests would be adversely affected by the lease's impacts to complain of the agency's action.  See Clarke, 479 U.S. at 399.  This conclusion is bolstered by the BIA's own regulations, which allow "any person whose interests could be adversely affected by a decision in an appeal" to request review of an agency action. 25 C.F.R. § 2.2; see also id. § 162.113 (allowing appeal of BIA lease approvals pursuant to 25 C.F.R. pt. 2).

Furthermore, "[t]he ['zone of interests'] test is not meant to be especially demanding."  Clarke, 479 U.S. at 399-400 ("[I]n particular, there need be no indication of congressional

-16-

purpose to benefit the would-be plaintiff."); see also Dennis v. Higgins, 498 U.S. 439, 461 (1991) ("The plaintiff need only demonstrate a plausible relationship between his interest and the policies to be advanced by the relevant provision." (internal quotation marks omitted)). When a plaintiff is not the subject of the regulatory action, as here, prudential standing requirements may be satisfied so long as "the plaintiff's interests are [not] so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id. Here, Plaintiffs have demonstrated, as discussed above, their concrete and particularized interest in the lands and environment surrounding Split Rock.[14] These interests are explicitly addressed in the Leasing Act as ones that the BIA must consider before granting approval of the lease. They are therefore not peripheral interests. Plaintiffs' interests are also consistent with the statute, which was "intended to protect . . . Native American interests," Rosebud Sioux Tribe v. McDivitt, 286 F.3d 1031, 1036-37 (8th Cir. 2002) (referring to 18

_____

[14]  The BIA suggests that we not consider Plaintiffs' argument that the zone of interests protected by the Leasing Act encompasses Plaintiffs' environmental concerns, because they make this argument for the first time on appeal. Plaintiffs, however, point to specific language in their complaint and in the transcript that shows they raised the issue before the district court. Additionally, though not dispositive, the BIA is hardly in an equitable position to make such a claim considering its shift in position on crucial issues from the stance it took before the district court as comparted to that before us.

U.S.C. § 416, an analog to § 415), and to ensure that the parties to the lease have adequately considered its impacts. Thus, we find that Plaintiffs meet the prudential standing requirement that their interests arguably fall within the zone of interests protected by the Leasing Act.[15] See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970) ("The question of standing . . . concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.").

## V. Trust Obligation Claim

The district court also dismissed Plaintiffs' claim of breach of fiduciary duty to the extent that it was a separate cause of action from the Leasing Act claim.[16] Nulankeyutmonen Nkihtaqmikon, 462 F. Supp. 2d at 111 ("[A] generalized claim of violation of a fiduciary duty, which is not tethered to any statute

---

[15] Contrary to the BIA's assertions, we cannot -- and will not -- affirm the dismissal at this stage of the proceedings on the ground that the BIA complied with the Leasing Act. Further, it is irrelevant to our analysis whether "[t]he true gravamen of [Plaintiffs'] complaint apparently lies with the Tribal Resolution authorizing the lease." Plaintiffs' have chosen their battleground and their opponent, and our review for standing is limited to the allegations of injury asserted in this suit.

[16] The district court was unclear as to whether Plaintiffs intended to assert a Trust Obligation claim apart from the Leasing Act claim. Nulankeyutmonen Nkihtaqmikon, 462 F. Supp. 2d at 110. Plaintiffs' explanation is no more enlightening on appeal, but we assume for purposes of our review that this was their intention.

or regulation, cannot stand."). On appeal, Plaintiffs argue that "the district court erred because the Indian Leasing Act is a codification of the trust duty," citing Brown v. United States for the proposition that "'[t]he scope and extent of the fiduciary relationship . . . is established by the regulation[s]' that control this type of leasing . . . [and] 'define the contours of the United States' fiduciary responsibilities.'" 86 F.3d 1554, 1563 (Fed. Cir. 1996) (emphasis omitted) (quoting Pawnee v. United States, 830 F.2d 187, 192 (Fed. Cir. 1987), and United States v. Mitchell (Mitchell II), 463 U.S. 206, 224 (1983)).

Although the district court and the parties addressed this issue in their discussions on standing, we construe the court's dismissal as one for failure to state a claim, and accordingly review de novo. See Palmer v. Champion Mortgage, 465 F.3d 24, 27 (1st Cir. 2006).

We agree with the district court that Plaintiffs' Trust Obligation claim cannot stand alone. Despite Plaintiffs' vague assertions to the contrary, we can find no law in support of an enforceable fiduciary duty owed by the federal government to Plaintiffs qua individuals who are not landowners. As Plaintiffs acknowledge, the "general trust relationship between the United States and the Indian people" is insufficient to establish specific fiduciary duties. United States v. Navajo Nation, 537 U.S. 488, 506 (2003). Substantive statutes and regulations must expressly

-19-

create a fiduciary relationship that gives rise to defined obligations. See id.; United States v. White Mountain Apache Tribe, 537 U.S. 465, 474 (2003). Brown found a fiduciary relationship between the government and Indian land owners who could lease their lands only subject to the Secretary's approval under the Long-Term Leasing Act precisely because the Secretary was acting in part to protect the land owners' financial interests, a traditional fiduciary capacity. Id. at 1562-63. In other cases finding enforceable fiduciary duties, too, the government had extensive management control over Indian-owned resources, and the duties arising from the government's fiduciary responsibilities were owed to the owners of the resources being managed. Compare Mitchell II, 463 U.S. at 224 (finding fiduciary relationship between government and Indian allottees where Secretary had "full responsibility to manage Indian resources and land for the benefit of the Indians"); Pawnee, 830 F.2d at 190 ("[T]he United States has a general fiduciary obligation toward the Indians [who own the oil and gas leases in question] with respect to the management of those oil and gas leases."), with United States v. Mitchell (Mitchell I), 445 U.S. 535, 542 (1980) (finding no fiduciary duty to Indian allottees where "[t]he Act [in question] does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands").

Here, Plaintiffs are not land owners and the BIA does not manage their interests in a fiduciary capacity. While Plaintiffs have standing to complain of the BIA's failure to comply with federal law because they fall within the zone of interests protected by the Leasing Act, they cannot claim a specific trust relationship created by the Secretary's general obligation to consider their interests before approving a lease. See Brown, 86 F.3d at 1562 ("[T]he statutory criteria that constrain the Secretary's exercise of his or her approval power are . . . in the nature of zoning, safety, or environmental concerns, which are the traditional general welfare concerns of government when acting in a non-fiduciary capacity." (internal quotation marks omitted)).

Although Plaintiffs have no fiduciary duty claim, their Leasing Act claim generally encompasses the same allegations, and the dismissal of the "separate" Trust Obligation claim in no way impairs their claimed right to the relief requested. The district court should therefore treat their references to the "Trust Obligation" as commensurate with the Leasing Act, which, as Plaintiffs explain, derives from the general trust obligation assumed by the federal government toward the Indian people. See Morton v. Mancari, 417 U.S. 535, 552 (1974) ("Literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA, [are] derived from historical relationships and explicitly designed to help only

-21-

Indians."); see also Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942) ("Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, [the government] has charged itself with moral obligations of the highest responsibility and trust." (footnote omitted)).  To the extent that the Trust Obligation claim is one and the same as the Leasing Act claim, Plaintiffs have established standing for the same reasons.

## VI. Ripeness

Whereas standing asks "who" may bring a claim, ripeness concerns "when" a claim may be brought.  R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999).  With respect to administrative decisions, the ripeness doctrine seeks "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967).  To determine whether a particular claim is ripe, we generally evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Doe v. Bush, 323 F.3d 133, 138 (1st Cir. 2003) (quoting Abbott Labs., 387 U.S. at 149).

Plaintiffs' remaining claims -- aside from the Trust Obligation claim -- allege that the BIA failed to comply with various federal laws before approving the Quoddy Bay lease. These claims of procedural injury are clearly ripe under Ohio Forestry Ass'n, Inc. v. Sierra Club: "[A] person with standing who is injured by a failure to comply with [statutory] procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." 523 U.S. 726, 737 (1998). The BIA now concedes that its approval was final, and therefore now is the appropriate time to complain that the agency failed to do its duty.[17]

The BIA argues, however, that Plaintiffs' claims are not ripe because "the existence of the dispute itself hangs on future contingencies that may or may not occur." Texas v. United States, 523 U.S. 296, 300 (1998). As we stated above with respect to standing, however, this argument misses the mark. Contrary to the BIA's characterization, Plaintiffs' alleged injury is the BIA's failure to follow federal law before approving the lease. The dispute before us is not over the hypothetical construction and operation of an LNG terminal, but the allegedly improper approval

---

[17] The district court ruled that Plaintiffs' claims were not ripe "because the lease approval process is not yet complete." Nulankeyutmonen Nkihtaqmikon, 462 F. Supp. 2d at 97. It further stated, however, "Had the BIA given a final, irrevocable stamp of approval on the ground lease . . ., NN would have a ripe claim . . . ." Id. at 98.

-23-

of the lease that is the prerequisite to the terminal.  While the construction of the terminal is hypothetical and uncertain at this juncture, the approval of the lease is complete.  The BIA has made its decision.

The BIA also argues that the alleged procedural failures have not yet occurred, even though its approval is final, because FERC will consider the impacts of the lease during the permitting process.  Moreover, the BIA will serve as a cooperating agency and contribute to review of the LNG project.  These points are well-taken, but they do not go to ripeness.  Whether the BIA can fulfill its statutory obligations by participating in the FERC process is a question on the merits of Plaintiffs' claims.

## VII. **Exhaustion**

In the alternative, the BIA argues that the district court lacks subject matter jurisdiction because Plaintiffs failed to exhaust their administrative remedies.  BIA regulations require an appeal to the Interior Board of Indian Appeals before lease approval is "final," and therefore subject to judicial review under the APA.  25 C.F.R. §§ 2.4(e), 2.6.

Plaintiffs correctly argue in response that exhaustion is not a jurisdictional bar in this case.  Exhaustion of administrative remedies is a jurisdictional requirement only when Congress clearly ranks it as such.  Cf. Arbaugh v. Y&H Corp., 126 S. Ct. 1235, 1237 (2006) ("[W]hen Congress does not rank a

statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). We have previously held that the APA's finality requirement is not jurisdictional in nature. R.I. Dep't of Envtl. Mgmt. v. United States, 304 F.3d 31, 40 (1st Cir. 2002) ("[T]he issue of whether the APA provides for judicial review of the nonfinal ruling is not one that, precisely speaking, implicates the subject-matter jurisdiction of the court."). Furthermore, the BIA has pointed to no "sweeping and direct" language in the Leasing Act itself -- nor do we find any -- that suggests that Congress intended exhaustion to be a prerequisite to federal court jurisdiction to review BIA lease approvals. Casanova v. Dubois, 289 F.3d 142, 146 (1st Cir. 2002) ("[T]he PLRA's exhaustion requirement . . . does not contain the type of sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements." (internal quotation marks omitted) (quoting Ali v. Dist. of Columbia, 278 F.3d 1, 5-6 (D.C. Cir. 2002))).

Although exhaustion is not a jurisdictional issue, it is mandatory, see id. at 147; R.I. Dep't of Envtl. Mgmt., 304 F.3d at 40 ("Even though the asserted lack of finality does not directly challenge the subject-matter jurisdiction of the district court, the question of whether the state otherwise has a valid cause of action is an important one that we address as a threshold issue."),

-25-

subject to certain exceptions, <u>White Mountain Apache Tribe</u> v. <u>Hodel</u>, 840 F.2d 675, 677 (9th Cir. 1988) ("There are exceptional circumstances where exhaustion may not be required."); <u>see also</u> <u>Frederique-Alexandre</u> v. <u>Dep't of Natural and Envtl. Res.</u>, 478 F.3d 433, 440 (1st Cir. 2007) ("[T]he exhaustion requirement is not a jurisdictional prerequisite, but rather is subject to waiver, estoppel, and equitable tolling . . . ." (citing <u>Zipes</u> v. <u>Trans World Airlines, Inc.</u>, 455 U.S. 385, 393 (1982))). On remand, the district court should consider whether Plaintiffs merit an exception to the exhaustion requirement. <u>See</u> <u>Casanova</u> v. <u>Dubois</u>, 289 F.3d 142, 147 (1st Cir. 2002) ("[W]e remand this case to the district court for development of the record with regard to the issue of exhaustion of administrative remedies.").

## VIII. <u>Conclusion</u>

For the reasons stated above, we reverse the district court's dismissal of Plaintiffs' NEPA, NHPA, ESA, and Leasing Act claims. We also reverse dismissal of the APA claim, given that Plaintiffs' other claims are revived. <u>See</u> <u>Nulankeyutmonen Nkihtaqmikon</u> v. <u>Impson</u>, 462 F. Supp. 2d at 112 (dismissing APA claim because other claims were dismissed). We affirm the district court's dismissal of the "Trust Obligation" claim to the extent that Plaintiffs intended a cause of action separate from the Leasing Act claim. Each party shall bear its own costs.

**<u>Affirmed in part, reversed and remanded in part</u>**.