# United States Court of Appeals
## For the First Circuit

No. 09-2643

ANIMAL WELFARE INSTITUTE and WILDLIFE INSTITUTE OF MAINE,

Plaintiffs, Appellants,

v.

ROLAND D. MARTIN, Commissioner of Maine Department of Inland
Fisheries and Wildlife, et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Howard, Circuit Judges.

Eric R. Glitzenstein, with whom William S. Eubanks II was on brief, for appellants.
Christopher C. Taub, Assistant Attorney General, with whom Janet T. Mills, Attorney General, Paul Stern, Deputy Attorney General, and Nancy Macirowski, Assistant Attorney General, were on brief for appellee Roland D. Martin, Maine Department of Inland Fisheries and Wildlife Commissioner.
James H. Lister, for appellees Maine Trappers Association, U.S. Sportsmen's Alliance Foundation, Fur Takers of America, Dana Johnson, Sr., Donald Dudley, and Carl Guay.
Gary R. Leistico, on brief for appellee National Trappers Association.

October 20, 2010

**LYNCH**, <u>**Chief Judge**</u>.   This is a case about the Canada lynx.   The Endangered Species Act makes it unlawful to "take" a member of an endangered species.   16 U.S.C. § 1538(a)(1)(B).   By regulation, it is also unlawful to "take" a "threatened" species, that is, one likely to become endangered in the foreseeable future. 16 U.S.C. § 1532(20); 50 C.F.R. § 17.31(a).   The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."   16 U.S.C. § 1532(19).

The Canada lynx is a wild cat, weighing about 20 pounds, which eats small animals, particularly the snowshoe hare, and is most commonly found in Canada.   It is not listed as an endangered species.   In 2000, the U.S. Fish and Wildlife Service (FWS) of the federal Department of the Interior listed the Canada lynx as a "threatened" species throughout its U.S. range: certain states contiguous to Canada, as well as certain Western states.   65 Fed. Reg. 16,052.   In Maine, a listed state, Canada lynx are found primarily in the northern portion of the state, in state Wildlife Management Districts (WMD) 1 through 11.   Maine prohibits the trapping of Canada lynx, but allows the regulated trapping of many other furbearing animals.

This appeal is from the district court's denial of plaintiffs' motion to enjoin Maine state officials from allowing the use of any foothold traps, which are used to legally trap other species, in WMDs 1 through 11.   Plaintiffs argued this relief was

necessary to prevent incidental takes of lynx in these traps. See 50 C.F.R. § 17.3 (defining incidental taking). The district court held that plaintiffs had not shown irreparable injury, even recognizing the special emphasis in the Endangered Species Act (ESA) on protecting threatened species. We affirm.

I.

Plaintiffs are two private groups, Animal Welfare Institute and Wildlife Institute of Maine (together "AWI"), that sued in August 2008, under the ESA citizen suit provision, 16 U.S.C. § 1540(g). They allege that Maine, by allowing trappers to obtain permits to use foothold traps (also called "leghold traps") to catch other species that are neither threatened nor endangered, violates the ESA because some individual lynx will incidentally be caught in such traps.

Foothold traps spring shut on an animal's leg or foot, holding the animal in place until the trapper returns. Trappers usually use foothold traps to trap coyote and fox. There are no known instances of lynx deaths caused by a foothold trap.[1] Still,

---

[1] In two instances in November and December 2008, Canada lynx died after being trapped in Conibear traps, which are usually used to trap fisher and marten and are designed to spring shut on an animal's body, killing it. See Animal Welfare Institute v. Martin, 588 F. Supp. 2d 70, 81-82 (D. Me. 2008) (AWI I) (November incident); Animal Welfare Institute v. Martin, 588 F. Supp. 2d 110, 111-12 (D. Me. 2008) (AWI II) (December incident). In both instances, the traps were illegally set. AWI II, 588 F. Supp. 2d at 112; AWI I, 588 F. Supp. 2d at 82. In response to the November 2008 incident, and under the district court's order, Maine amended its Conibear trap regulations. Animal Welfare Institute v. Martin,

-3-

historically, a small number of Canada lynx are trapped and released each year in Maine.

Earlier litigation over the protection of the Canada lynx, brought by an organization called the Animal Protection Institute[2] (API) in October 2006, had resulted in a consent decree which provided significant protections for the Canada lynx. See Animal Welfare Institute v. Martin, 588 F. Supp. 2d 70, 76-77 (D. Me. 2008) (AWI I) (describing earlier litigation).

Under that consent decree, Maine issued new regulations in 2007 and 2008, which limited the size of foothold traps in lynx territory in an effort to reduce the number of incidental takes of Canada lynx.[3] Maine also attempted to reduce any harm from

---

668 F. Supp. 2d 254, 257 (D. Me. 2009) (AWI III). The trapper who caused the December 2008 killing had been warned earlier in the season that his traps flagrantly violated the regulations, and he faces federal prosecution. See Trapper charged in deaths of lynx, gray jay, Bangor Daily News, July 3, 2010, at B5. The records of the Maine Department of Inland Fisheries and Wildlife (IF&W) also show that two lynx were trapped and killed by Conibear traps in 2005, under a prior set of regulations.

In addition, in October 2009, a bird hunter illegally shot a Canada lynx that was caught in a legally set foothold trap. The lynx would otherwise have been released without need for treatment. AWI III, 668 F. Supp. 2d at 261 n.9.

[2] Many of the persons involved in the API litigation are principals of the present plaintiffs.

[3] The consent decree required that Maine limit the size of foothold traps to 5 3/8 inches or less (unless set in water, where lynx do not venture), and limit "killer-type" or Conibear traps to areas where lynx are unlikely to wander, such as around water, or at least four feet above ground in poles or trees less than four inches in diameter and at least a 45-degree angle from the ground. AWI I, 588 F. Supp. 2d at 76-77.

-4-

incidental takings of Canada lynx by requiring trappers to report any incidental Canada lynx takings. This, in turn, allows biologists from the Maine Department of Inland Fisheries and Wildlife (IF&W) to examine the captured lynx and rehabilitate any injured lynx before releasing them to the forests.

The consent decree remains in effect unless and until the FWS acts favorably on Maine's application for a federal "incidental take permit" (ITP).[4] 16 U.S.C. § 1539(a)(1)(B). An ITP allows takes incidental to otherwise lawful activity when requisite measures to minimize and mitigate harms are taken such that the permitted incidental takes will not "appreciably" impact the species as a whole. 16 U.S.C. § 1539(a)(2). Maine filed its first draft ITP application in August 2006; Maine filed a complete ITP application in June 2007, and in August 2008, at the request of FWS, filed a revised application. FWS has taken no action yet on the application and so the consent decree continues in effect.[5]

The present plaintiffs, apparently dissatisfied with the relief accomplished earlier, filed suit in August 2008 alleging

---

[4] The consent decree will also expire if the Canada lynx is delisted, or if FWS promulgates a rule under Section 4(d) of the ESA, allowing incidental takes of Canada lynx. See 16 U.S.C. § 1533(d) (authorizing Secretary to promulgate special rules for threatened species); 50 C.F.R. § 17.31.

[5] In an email dated September 7, 2010, the day before oral argument, FWS informed Maine that its ITP application faced many more layers of review, and that FWS was confident the ITP would not be issued in time for the 2010 trapping season, which runs from mid-October through December.

that Maine had not done enough.[6]  Unless and until an ITP is issued, they argued, the court was required by the ESA to issue a preliminary injunction banning all foothold traps.  The court rejected the argument that as a matter of law injunctive relief must issue, even absent a showing of irreparable harm, upon a showing that incidental takings result from Maine's decision to allow any foothold traps.  AWI I, 588 F. Supp. 2d at 104-05.  The court denied preliminary injunctive relief as to foothold traps, but set the matter for hearing on evidence as to the actual risk of incidental trapping in foothold traps and actual consequences to the Canada lynx of any such trapping.

As to Conibear traps, the court granted preliminary injunctive relief on November 26, 2008, enjoining IF&W to immediately promulgate regulations, by emergency order if necessary, to prevent further takes in these "killer-type" traps.  Id. at 110.  The court found irreparable harm in the death of a single lynx that had been killed by a Conibear trap in November 2008 (a second lynx was killed in a Conibear trap shortly after the court issued its opinion).  Id. at 103.  Even though AWI had "not established that the death of one threatens the species as a whole," it had demonstrated that "the current regulations are

_____

        [6]  Several trappers' groups and three individual trappers intervened as defendants, as they did in the earlier litigation. In addition, the Pacific Legal Foundation has filed a brief as amicus curiae in support of the defendants-appellees.

-6-

inadequate and it is predictable that if the regulations are not amended, other lynx will suffer irreparable harm." Id. at 106. The court found that under the ESA the balance of hardships and public interest factors "tip[] heavily in favor of the protected species." Id. (quoting Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir. 1997)) (internal quotation marks omitted).

In April and June 2009, the district court held a six-day hearing, which had extensive evidence as to both types of traps. The court found AWI had not shown it was likely that lynx would be taken in Conibear traps under the new regulations promulgated by Maine as a result of the preliminary injunction. AWI III, 668 F. Supp. 2d at 260. AWI does not appeal this finding and so Conibear traps are not at issue in this appeal.

Maine conceded that Canada lynx would continue to be caught in foothold traps, even after the tighter regulations. AWI III, 668 F. Supp. 2d at 261. As to consequences to the lynx of being caught in a foothold trap, the court found as a matter of fact that AWI had failed to prove lynx suffer serious physical injury from incidental takes in foothold traps. The court recounted IF&W's records of lynx takings from 1999 to 2008, distinguishing between periods before and after the tighter regulations were imposed in 2007. Id. at 268. In the seven-year period from 1999-2006, during which thirty lynx were taken in foothold traps, IF&W was able to assess just under half, and only

-7-

one had an injury that required veterinary treatment.  Id.  None of the thirty died as a direct result of being trapped.  Id.  In 2007-2008, eight lynx were taken and IF&W was able to assess five of them: two sustained no injuries, and the other three had minor skin lacerations (one also had a "very slight limp upon release").  Id.

The court found that AWI had failed to prove the truth of its assumption that most of the taken lynx suffered some sort of injury, or to provide any reliable data to counter IF&W's evidence.  Id. at 269.  Rather, AWI relied on studies about lingering negative effects of trapping on other species, or, in one case, about the convergence of multiple stressors on Canada lynx in a different part of the country.  See id. at 270 & n.16.  The court found that AWI's use of generalizations from other regions and species amounted to a "failure of proof."  Id. at 269.  On the question of whether Canada lynx caught in incidental takes in foothold traps would be more likely to die from predation or starvation in the future, the court found that any "incremental impact is unknown and probably unknowable."  Id. at 272.

The court did accept the testimony of AWI's experts that Canada lynx might experience physical symptoms of stress--such as an elevated breathing rate and temperature, or hormonal or other chemical changes--as a result of being trapped.  Id. at 266-67.  But the court rejected expert testimony that Canada lynx could die from "capture myopathy," a deterioration of the animal's organ

-8-

systems resulting from stress-induced overproduction of lactic acid during a temporary capture.  Id. at 267.  The court was skeptical that any stress caused by incidental takes in foothold traps could be so damaging for two reasons.  First, it was unlikely a temporary trapping by humans would cause stress-induced death if the stress of daily survival efforts does not.  Id.  Second, there was firm evidence that some lynx repeatedly visit traps for food despite repeatedly being trapped, undercutting AWI's argument that being trapped is an intensely stressful experience for lynx.  Id.

Given these factual findings, the court concluded AWI had failed to demonstrate that irreparable harm was likely to occur absent an injunction.  The court further noted that even assuming AWI had shown that some Canada lynx suffer "debilitating" injuries from takes, it certainly had not established that these injuries threatened the Canada lynx species.  Id. at 272.  The court quoted the holding in Water Keeper Alliance v. U.S. Department of Defense, 271 F.3d 22, 34 (1st Cir. 2001), that absent a showing that animal deaths were likely and that these would impact the species, it was not an abuse of discretion to refuse to issue an injunction.  Id. Plaintiffs do not challenge the findings of fact.

II.

We start with the question of standing.  While Maine has not challenged the plaintiffs' standing, we have jurisdiction only if plaintiffs meet the constitutional standing requirements.  Lujan

-9-

v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992). Plaintiffs "must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the [defendant's] allegedly unlawful actions, and (3) that 'it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" <u>Nulankeyutmonen Nkihtaqmikon</u> v. <u>Impson</u>, 503 F.3d 18, 26 (1st Cir. 2007) (quoting <u>Lujan</u>, 504 U.S. at 560-61) (second alteration in original). Plaintiffs must clearly allege facts demonstrating standing; we then construe those facts and reasonable inferences drawn from them in plaintiffs' favor. <u>Id.</u> at 25.

In addition, as a prudential matter, each plaintiff organization may sue based on injuries to its members' interests only if (1) at least one of its members would have standing to sue as an individual, (2) "the interests at stake are germane to the organization's purpose," and (3) individual members' participation is not necessary to either the claim asserted or the relief requested.[7] <u>Friends of the Earth, Inc.</u> v. <u>Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000); <u>see</u> <u>also</u> <u>Dubois</u> v. <u>U.S. Dep't of Agric.</u>, 102 F.3d 1273, 1281 & n.11 (1st Cir. 1996). Animal Welfare Institute's purpose as an organization is "to reduce

---

[7]    Another traditional prudential requirement, that plaintiffs' claims be within the "zone of interest" protected by the law they invoke, was overridden by Congress in the ESA's citizen suit provision. <u>Bennett</u> v. <u>Spear</u>, 520 U.S. 154, 164 (1997).

the sum total of pain and fear inflicted on animals by humans," and Wildlife Institute of Maine's purpose is "to advoca[te] for wildlife and represent[] nonconsumptive interests of wildlife in Maine." The interests invoked in this litigation in observing the Canada lynx free from incidental trapping are germane to these purposes.

Plaintiffs' affidavits from members who are Maine residents assert the members frequently visit wildlife refuges and parks in Maine to try to observe lynx and other wildlife species. This "desire to use or observe an animal species . . . is undeniably a cognizable interest for purpose of standing." Lujan, 504 U.S. at 562-63. The members also allege a cognizable injury to this interest: that Maine's trapping regulations, by causing Canada lynx to be taken, interfere with the Canada lynx's natural state and may increase the animals' risk of death, reducing the likelihood that the members will observe Canada lynx in their natural state on future visits. See id. at 564; see also Friends of the Earth, 528 U.S. at 183 (stating plaintiffs meet injury in fact requirement by averring (1) they use the affected area and (2) the challenged activity will lessen their recreational and aesthetic interest in the area); Sierra Club, 405 U.S. at 734 (finding that an adverse effect on the "scenery, natural and historic objects, and wildlife" of a park that "would impair the enjoyment of the park" by those who use it would constitute a

-11-

cognizable harm).  Plaintiffs have adequately alleged that this injury is fairly traceable to the challenged IF&W regulations, and redressable by the injunctive relief plaintiffs seek.

III.

In order to obtain a permanent injunction plaintiffs must ordinarily satisfy a four-factor test.  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Monsanto v. Geertson Seed Farms, 130 S. Ct. 2743, 2756 (2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)) (internal quotation marks omitted).

For purposes of this case we will assume that the incidental taking of Canada lynx in foothold traps results in a violation of the ESA.[8] The questions before us have to do with the appropriate remedies for such a violation.  Our standard of review of denial of injunctive relief depends upon the nature of the issues involved.  Overall, review is for abuse of discretion.

---

[8] We need not reach Maine's argument that it has not violated the ESA by licensing trappers who take lynx, nor Maine's argument that the injunctive relief requested by plaintiffs would violate the Tenth Amendment.

Garcia-Rubiera v. Calderon, 570 F.3d 443, 455-56 (1st Cir. 2009).
Nonetheless, review of underlying legal determinations is de novo.
Id.

Plaintiffs attempt to characterize their case as turning on pure issues of law, and they make several related arguments. First they argue that Congress, in enacting the ESA, has so displaced the traditional four equitable factors used by courts in deciding on injunctive relief that the district court was required to issue an injunction on finding there was a "taking" of a single member of a threatened species. AWI argues that in the ESA, Congress circumvented the traditional injunction inquiry, mandating prioritization of species protection, which curtails courts' traditional discretion to deny equitable relief. They base this argument on United States v. Oakland Cannabis Buyers' Cooperative, 532 U.S. 483, 496-98 (2001), and Weinberger v. Romero-Barcelo, 456 U.S. 305, 313-14 (1982). They are wrong.

Even under the ESA, the Supreme Court has said that courts are "not mechanically obligated to grant an injunction for every violation of law." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 193 (1978). While reciting this language, AWI's actual argument is to the contrary. AWI argues that where a court finds an ongoing violation of the ESA, the court is indeed obligated automatically to issue an injunction with terms stringent enough to end the violation, regardless of what the facts may be. That is not so.

-13-

AWI's claims are based on a mistaken reading of a line of cases beginning with Hill, in which the Supreme Court found that only a permanent injunction against bringing a $100 million dam online would suffice to remedy the Tennessee Valley Authority's violation of Section 7 of the ESA.[9] Id. at 172. The dam, if operated, would completely destroy the entire habitat of the (newly discovered) endangered snail darter, thereby extinguishing the species. Id. at 171-72. The Court stated that "Congress has spoken in the plainest of words [in the ESA], making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." Id. at 194. The Court held that it was not free to balance the equities where Congress had mandated "institutionalized caution" for the protection of listed species, and that it must therefore enjoin the dam's operation. Id.

The Supreme Court has since explained that the drastic result in Hill stemmed from the strong and undisputed showing of irreparable harm that would occur absent an injunction: an entire species would become extinct. Oakland Cannabis, 532 U.S. at 496-97; Weinberger, 456 U.S. at 314. Since the existence of

_____

[9] At the time, Section 7 required federal agencies to make sure their actions did not "jeopardize the continued existence" of listed species "or result in the destruction or modification of habitat of such species." Endangered Species Act of 1973, Pub. L. No. 93-205, § 7, 87 Stat. 884, 892 (codified as amended at 16 U.S.C. § 1536(a)(2)).

-14-

irreparable harm was essentially conceded in Hill, the discussion of remedy focused on the changes the ESA made to the remaining elements of the injunction analysis. See Hill, 437 U.S. at 193-94. After stating the general proposition that a court sitting in equity balances the equities and hardships of a case in its discretion, id. at 193, the Court went on to find that congressional intent in the ESA foreclosed the Court from "strik[ing] a balance of equities on the side of the Tellico Dam," id. at 194. Rather, it was "abundantly clear that the balance has been struck in favor of" endangered species. Id.

The circumstances here are none so dire, as the district court's uncontested findings of fact show. AWI did not prove that any single Canada lynx has suffered serious physical injury or death from an incidental take in a foothold trap. The district court found the statutory violation here has not caused the death of any Canada lynx, let alone that it poses the ultimate danger of extinction to which the Hill Court responded.

By contrast, the district court held that Maine's previous, now-replaced Conibear trap regulations did pose a mortal risk to at least some Canada lynx, and the district court issued an injunction, forcing Maine to amend its regulations immediately. AWI I, 588 F. Supp. 2d at 109. The district court thus engaged in exactly the fact-sensitive analysis required by law.

-15-

This circuit has consistently applied the traditional tests for preliminary injunctions in ESA cases, without modifying the irreparable harm requirement. See, e.g., Water Keeper, 271 F.3d at 33 ("To be entitled to preliminary injunctive relief, appellants must demonstrate that they will otherwise suffer irreparable harm."); Coxe, 127 F.3d at 160. Rather than supplant the need for proof on the irreparable harm requirement, as AWI seeks, this circuit's law has incorporated Congress's prioritization of listed species' interests into the third and fourth prongs of the analysis, modifying those factors where appropriate to "tip[] heavily in favor of protected species." Coxe, 127 F. 3d at 160 (quoting Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1510 (9th Cir.1994)) (internal quotation mark omitted); see also Hill, 437 U.S. at 194 (stating Congress limited courts' discretion to balance the equities in ESA cases); Water Keeper, 271 F.3d at 34. The district court properly required AWI to demonstrate irreparable harm.

In a related statutory construction argument, AWI asserts that the purpose and language of the Section 9 prohibition on "taking" listed species make all takes of any threatened species per se irreparable harm. AWI argues that it needs to show neither species-level effect, since Section 9's purpose is to prohibit takes of individual animals, nor any actual harm to individual animals: since the statutory definition of "take" includes both

-16-

"trap" and words like "wound," "harass," and "harm," AWI argues, requiring a showing of some injury would make "trap" superfluous and read it out of the definition. See Babbit v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 703 (1995) (characterizing a take of a single animal as a statutory violation). AWI's argument mistakes the question of what violates the statute with the question of the appropriate remedy for a violation.

AWI makes a final argument that as a matter of law the district court could not inquire into species-level harm during the irreparable harm inquiry because that would conflict with the role Congress has assigned to the FWS through the ITP process. There is no language in the ESA which supports this argument. Congress provided both that courts may issue injunctive relief and that FWS may issue ITPs. No language limits the power of courts as AWI claims nor is there any conflict between the two provisions. In fact they are consistent with each other.

Section 10 of the ESA provides, "The Secretary[10] may permit, under such terms and conditions as he shall prescribe," any incidental taking otherwise prohibited by Section 9 that will not

---

[10]    Depending on the animal species at issue, "Secretary" in the ESA means either the Secretary of Commerce (for species overseen by the National Marine Fisheries Service) or the Secretary of the Interior (for all other species, which are overseen by FWS). See 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b). Here, then, the Secretary is the Secretary of the Interior, whose authority under the ESA has been delegated to FWS. See 50 C.F.R. § 402.01(b).

-17-

"appreciably reduce" the likelihood that the species will survive and recover.[11]  16 U.S.C. § 1539(a)(1)(B), (2)(B).  While FWS must issue a permit to any plan that meets its application requirements, 16 U.S.C. § 1539(a)(2)(B), FWS may alter application requirements as "necessary or appropriate," 16 U.S.C. § 1539(a)(2)(A)(iv).  Plaintiffs' request for injunctive relief depends entirely on the fact that the FWS has not yet issued an ITP to Maine.

Nothing in the statutory language about ITPs constrains the power of the federal judiciary.  Similarly, nothing in the citizen suit provision purports to subordinate judicial remedies to the ITP process.  The provision simply states that "[t]he district courts shall have jurisdiction . . . to enforce any . . . provision or regulation, or to order the Secretary to perform such act or duty," at issue in a citizen suit.[12]  16 U.S.C. § 1540(g)(1).  There is no reason to think that while Congress intended for FWS to

---

[11]  In addition, FWS must ensure the takings are incidental to otherwise lawful activity, the permittee will "minimize and mitigate the impacts" of the taking "to the maximum extent practicable," the permittee will adequately fund its plans to do so, and the application meets any other requirements FWS considers "necessary or appropriate."  16 U.S.C. § 1539(a)(2)(B).

[12]  Separate provisions grant jurisdiction and process powers to the district courts over civil and criminal enforcement suits brought by the United States.  16 U.S.C. § 1540(c), (e)(2).
    The statute constrains district courts' discretion over citizen suits for injunctive relief in only one circumstance: if the suit is to compel FWS to enforce the taking prohibition, and the district court finds there is substantial evidence of an "emergency," then the district court "shall compel" FWS to apply the taking prohibition.  16 U.S.C. § 1540(g).

consider the facts as to whether species-wide harm would be done before it can issue an ITP, it intended to preclude a federal judge from considering the same facts.

IV.

A.   Permanent Injunction

The district court's denial of a permanent injunction was not an abuse of discretion.  AWI characterizes the district court as adopting a per se rule requiring that plaintiffs show that "a particular take will result in the extinction of the entire species."  AWI misrepresents the district court's reasoning.

The district court differentiated its "nuanced" approach from the two opposite per se rules advanced by the opposing parties.  The plaintiffs maintain that harm to a single animal constitutes irreparable harm while defendants argue that only a threat to the entire species constitutes irreparable harm.[13]  AWI III, 668 F. Supp. 2d at 261; AWI I, 588 F. Supp. 2d at 106. Rejecting both approaches, the court "accept[ed] the principle that the death of a single animal" may call for an injunction in some circumstances, while in others "the death of one member is an isolated event that would not call for judicial action," AWI I, 588 F. Supp. 2d at 106, because it has only a "negligible impact on the

---

    [13]   Because in the decision on appeal the district court expressly incorporated its earlier opinions in the case, AWI III, 668 F. Supp. 2d at 258, we also refer to the text of the district court's earlier opinion on AWI's motion for a preliminary injunction, AWI I.

-19-

species as a whole," AWI III, 668 F. Supp. 2d at 264. The court's issuance of injunctive relief as to Conibear traps while declining to issue relief as to foothold traps demonstrates the point.

The factual findings which supported the denial of injunctive relief are not challenged. Denial of that relief was not error.

### B. Other Relief

AWI argues that even if it did not show irreparable harm sufficient for the injunction it sought, the district court should have issued both a declaratory judgment and alternate relief.

AWI argues it was entitled to a declaratory judgment, for which irreparable harm need not be shown. See Steffel v. Thompson, 415 U.S. 452, 471-72 (1974). The district court did not abuse its discretion in deciding not to issue a declaratory judgment. See Garcia-Rubiera, 570 F.3d at 455. The court, in two published decisions, made findings that Maine had violated the ESA through the incidental takings. AWI III, 668 F. Supp. 2d at 259; AWI I, 588 F. Supp. 2d at 99-100. It acknowledged the relief obtained through the consent decree, and it issued injunctive relief as to the Conibear traps, which caused a change in Maine's regulations. See AWI III, 668 F. Supp. 2d at 257-58. It was within the court's discretion to conclude that such relief was an adequate remedy and a further formal declaration was not needed. See Wilton v. Seven

<u>Falls Co.</u>, 515 U.S. 277, 286-87 (1995); <u>Ernst & Young</u> v. <u>Depositors Econ. Protection Corp.</u>, 45 F.3d 530, 534 (1st Cir. 1995).

AWI, on appeal, additionally argues the district court erred in not granting other relief, such as a new working group or new regulations. This argument fails because AWI expressly disavowed such remedies before the district court.[14] It may well have done so for tactical reasons, preferring to stress the inadequacy of other remedies in order to strengthen its case for injunctive relief against foothold traps. Parties are held to their choices and AWI's bait and switch tactics in the courts are to be deplored, not rewarded.

The judgment for defendants is affirmed. Costs are awarded to defendants.

---

[14] In its post-trial brief AWI specifically disclaimed any injunctive relief other than a total ban on foothold traps in lynx areas and a total ban on Conibear traps with openings of more than four inches, arguing that the bans were "the only way to prevent further take of lynx in traps." AWI clearly stated it was "concerned with the two alternatives offered by the court." AWI claimed a working group was not "a viable solution" because "the parties are at polar opposites and it would be difficult to come to a consensus in a working group" before the 2009 trapping season began. AWI argued further that "allowing" IF&W to work on new regulations would likely not end takes because IF&W had already failed once, under the 2007 consent decree, to amend its regulations to end takes.